# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PATRICIA A. POWERS-BUNCE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **Civil Action No. 06-1586 (RMC)** |
| | ) |
| DISTRICT OF COLUMBIA, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## FEDERAL DEFENDANTS' RENEWED MOTION TO DISMISS
## OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

The Federal Defendants, through counsel, the United States Attorney for the District of Columbia, respectfully renew their motion to dismiss as to the First Amended Complaint for Violation of Civil Rights, Other Causes of Action, and Damages, pursuant to Fed. R. Civ. P. 12(b)(1) and (6),[1] inasmuch as no subject matter jurisdiction exists in this court over claims asserted and as the Complaint fails to state claim upon which relief may be granted. In the alternative, pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant moves the Court for summary judgment on the grounds that no genuine issue of material fact exists, and Defendant is entitled to judgment as a matter of law.

---

[1] Federal Defendants move alternatively for dismissal pursuant to Fed. R. Civ. P. 12 (b)(2), (4) and (5). See n.1 of Memorandum of Points and Authorities.

In support of this motion, Federal Defendants respectfully refer the Court to the accompanying Memorandum of Points and Authorities, Statement of Material Facts Not in Genuine Dispute, and proposed order.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney


_____/s/_____
OLIVER W. McDANIEL, D.C. Bar #377360
Assistant United States Attorney

Counsel for Federal Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PATRICIA A. POWERS-BUNCE** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 06-1586 (RMC)** |
| | ) |
| **DISTRICT OF COLUMBIA,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF FEDERAL DEFENDANTS' RENEWED MOTION TO DISMISS**
**OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

The Federal Defendants, through counsel, the United States Attorney for the District of Columbia, respectfully submit this memorandum of points and authorities in support of their motion to dismiss or in the alternative, for Summary Judgment. Federal Defendants submit that Plaintiff has failed to allege conduct on the part of the federal officials sued in their individual capacities on which a valid claim of liability could be based. Further, the violation of no clearly established constitutional right has been established. Plaintiff's common law claims also fail.

## I.    BACKGROUND

### Procedural History

By memorandum opinion and order dated March 28, 2007, this Court granted in part, and denied in part, the Federal Defendants' and the District of Columbia Defendants' motions to dismiss the initial Complaint filed in this matter. Initially, the Federal Defendants encompassed by the Complaint included Michael J. Sullivan, Chief, United States Secret Service, Officer Michael Burdyn and Sergeant Benita Giles of the U.S. Secret Service, Uniformed Division, the unnamed Chief of the U.S. Secret Service, Uniformed Division, and the U.S. Secret Service, Uniformed

Division.  However, the Court ordered Michael J. Sullivan, the USSS/UD Chief and the USSS/UD agency dismissed and required Plaintiff to file a more definite statement as to the liability of Burdyn and Giles.  The Court dismissed the unlawful search and seizure claims without prejudice and did not include them in the request for a more definite statement.  Mem. Op. at 18.  The Court dismissed the common law claims filed against Burdyn and Giles as beyond the Court's jurisdiction under the Federal Tort Claims Act (FTCA).

## The Amended Complaint

By Amended Complaint filed on April 16, 2007, apparently her "more definite statement," the Plaintiff now alleges that on July 15, 2004, Terence Powers ("Powers") was unlawfully arrested or detained, taken to the Third District Station of the District of Columbia Metropolitan Police Department (MPD), subjected to excessive force and left somewhat isolated in a jail cell, where he committed suicide by hanging himself with tube socks.  Am. Compl. at ¶¶ 10, 16, 21, 24- 27, 32, 37-39.  Civil rights and constitutional claims are advanced, Am. Compl. at ¶¶ 43-50, as well as common law claims of intentional infliction of emotional distress, Am.Compl. at ¶¶ 51-53, gross negligence, Am. Compl. at ¶¶ 54-57, and a claim against the District of Columbia for a failure to train and supervise its police officers, Am. Compl. at ¶¶ 58-62.  Plaintiff seeks $10,000,000.00 in punitive damages and other forms of relief.  Am. Compl. at ¶¶ 12-13.  These claims should be dismissed, or Federal Defendants are entitled to judgment as a matter of law on any claims applicable to them.

## Factual Background

On July 15, 2004, at approximately 12:30 a.m., Michael Burdyn, an Officer of the U.S. Secret Service, Uniformed Division ("USSS/UD"), was on patrol. Declaration of Michael Burdyn

(hereinafter "Burdyn Dec"), attached hereto as Exhibit 1, at ¶ 2. At this time, he observed the driver of a black Mazda Miata, traveling eastbound on Massachusetts Ave., N.W., drive through a red traffic signal at the intersection of Massachusetts Avenue and Dupont Circle. Id. Officer Burdyn stopped the driver for the traffic violation at 12:39 a.m. in front of 1776 Massachusetts Ave., N.W. Id. He then communicated to his police radio dispatcher about the stop and waited for assistance from other officers. Id.

Officer Ray McQueen of the USSS/UD arrived to assist shortly thereafter. Burdyn Dec at ¶ 3. Officer Burdyn and McQueen approached the vehicle. Id. Officer Burdyn approached and positioned himself at the driver's window, and Officer McQueen positioned himself on the passenger-side of the car. Id. Officer Burdyn identified himself and explained to the driver, whom he identified as Mr. Terence Anthony Powers, that he stopped the car because Mr. Powers had failed to stop at the red light. Id. Officer Burdyn asked Mr. Powers for his driver's license, vehicle registration and proof of insurance. Id. Mr. Powers handed him a North Carolina driver's license and a registration for the Mazda. Id. Officer Burdyn then returned to his patrol car. Id.

Officer Burdyn checked Mr. Powers' driver's license through the Washington Area Law Enforcement System, which revealed that his license was suspended in North Carolina. Burdyn Dec at ¶ 4; Declaration of Benita Giles (hereinafter "Giles Dec"), attached hereto as Exhibit 2, at ¶ 3. While Officer Burdyn was at his cruiser, Officer McQueen, who was still positioned next to the passenger's side of the car, observed Mr. Powers reach behind the front passenger's seat with his right hand and remove an unknown object. Burdyn Dec at ¶ 5. He then observed Mr. Powers manipulating that object, which Mr. Powers placed in the map pocket. Id. Officer McQueen was concerned that the item could be a weapon, so he instructed Mr. Powers to get out of the car. Id.

At this time, Officer Burdyn returned to the Miata and took control of Mr. Powers while Officer McQueen examined the object in the map pocket, which was a cigarette box. Burdyn Dec at ¶ 5. Inside the box, Officer McQueen found five one-inch by one-inch plastic bags containing a powdered white substance. Id.; Giles Dec at ¶ 4. He then handed the box to Officer Burdyn. Burdyn Dec at ¶ 5. When Sergeant Benita Giles of the USS/UD arrived on the scene, Officers Burdyn and McQueen had Mr. Powers out of the black Mazda Miata that he was driving. Giles Dec at ¶ 3. As per her duties, Sergeant Giles had been dispatched to the scene to serve as the supervising official. Id. at ¶ 2. Mr. Powers admitted that the bags belonged to him. Burdyn Dec at ¶ 6; Giles Dec at ¶ 4. Mr. Powers also stated that he had been at a club on P street, but he could not give the name of the club. Burdyn Dec at ¶ 7. He explained that he saw another car run the red light, so he decided to do so as well. Id. However, no other cars were around at the time. Id.

Mr. Powers denied any alcohol consumption. Burdyn Dec at ¶ 8. He did not slur his words. Id. Officer Burdyn did not have the smell of alcohol on his breath. Id. Officer Burdyn, along with the other officers at the scene, did suspect that he was under the influence of some illegal substance. Id.; Giles Dec at ¶ 7; Declaration of Robert J. Beres, June 18, 2007 ("Beres Dec"), attached hereto as Exhibit 3, at ¶ 5. At the beginning of the traffic stop, Mr. Powers was calm. Burdyn Dec at ¶ 9. He became jumpy and nervous as the arrest progressed. Id. He said that it was his first arrest. Id. He was concerned about what would happen to the Mazda, which he said belonged to his mother. Id. The car was later impounded for safekeeping and not because of the crime. Id.

Crime Scene Technicians determined that the substance in the bags tested positive for cocaine. Burdyn Dec at ¶ 10; Giles Dec at ¶ 4. They took possession of the five bags of cocaine. Id. Officer Burdyn placed Mr. Powers under arrest for Possession with Intent to Distribute Cocaine

4

and for driving without a valid driver's license.  Burdyn Dec at ¶ 11; Giles Dec at ¶ 5.  Mr. Powers was handcuffed, searched incident to arrest, and his personal property was removed, including his belt and jewelry.  Id. ; Beres Dec at ¶ 5.

Sergeant Robert J. Beres arrived to transport Mr. Powers to the Third District Metropolitan Police Station.  Giles Dec at ¶ 6; Beres Dec at ¶ 3.  Sergeant Beres patted down Mr. Powers  before he was placed in the cruiser for transport.  Id.; Beres Dec at ¶ 4.  Mr. Powers's boots were removed for inspection, then his belt and other personal belongings were taken from him to ensure the safety of himself and the officers.  Giles Dec at ¶ 6.  Sergeant Giles inspected Sergeant Beres's cruiser before Mr. Powers was transported therein.  Id.; Beres Dec at ¶ 4.  Mr. Powers was placed in the back seat of the cruiser in handcuffs then transported to the Third District Station of the Metropolitan Police Department for booking.  Burdyn Dec at ¶ 11; Giles Dec at ¶ 6; Beres Dec at ¶ 4.

When Sergeant Beres arrived at the Third District Station, he took Mr. Powers into the station and turned him over to MPD Officers in charge of the Third District cellblock and left the station.  Beres Dec at ¶ 6.  Officers Brown and Burdyn assumed control over Mr. Powers when he arrived at the 3rd District Station sallé port.  Burdyn Dec at ¶ 12.  Officer Burdyn read Powers his rights.  Id.  While waiting outside the cell block for the MPD officer to receive the prisoner, Officer Burdyn removed his handcuffs from Powers and had him stand against a wall.  Id.  He walked him into the cell block when the MPD officer was ready.  Id.  Officer Burdyn searched him again and found another zip bag with a white substance in the small coin pocket of his pants.  Id.  Officers Brown and Burdyn then transferred Powers over to the 3rd District cell block officer, who also searched Mr. Powers.  Id.

The Third District officer assigned Mr. Powers a cell. Burdyn Dec at ¶ 13. The USSS/UD had no control over that function. Id. Officer Burdyn accompanied Mr. Powers, along with the MPD cell block officer, back to the cell. Id. Mr. Powers did not make a request to use the phone. Id. Officer Burdyn then went to the officer processing room at the 3rd District to finish the arrest paperwork with Officer Brown. Id.

At no time during the arrest was the use of force against Mr. Powers necessary, and no physical force was used on him. Burdyn Dec at ¶ 14; Giles Dec at ¶ 7; Beres Dec at ¶ 5 ("Mr. Powers was compliant when being transported, and no use of force was required by any officer at the scene to control him, and no force was used on Mr. Powers during the transport.") . The arrest of Mr. Powers was executed according to USSS/UD and MPD policies and procedures. Id. Mr. Powers showed no indications that he could not be left alone in a cell or that he was a threat to himself. Id. He did not talk during transport. Beres Dec at ¶ 5. Mr. Powers appeared calm and made no statements and took no actions suggesting that he was suicidal. Burdyn Dec at ¶ 14; Beres Dec at ¶ 5; Giles Dec at ¶ 7 (Officer Giles "observed nothing at the scene to indicate that Mr. Powers required special measures in his transport or detention.").

Sergeant Giles arrived at the Third District Station after Mr. Powers had been taken back for booking, and Sergeant Giles had no contact with him. Giles Dec at ¶ 8. She went to the officer processing room to set up the laptop computer. Id. As the supervising official, she was responsible for completing the arrest paperwork. Id. Sergeant Giles entered information into the computer as told to her by Officer Burdyn, and assisted him and Officer Brown with completion of the arrest paperwork. Id. Mr. Powers's Miranda Rights card was completed and all rights were marked "yes." Id. Further, no immediate discussion with Mr. Powers was necessary because he had already

6

admitted to possessing the cocaine.  Id.  Sergeant Giles directed Officer Burdyn to obtain Mr. Powers's signature on the impoundment notice of his mother's Mazda.  Id.

Officer Burdyn returned to the cell block to obtain Mr. Powers's signature on the notice of impoundment 40 minutes to 1 hour after his last contact with him.  Burdyn Dec at ¶ 15.  He found Mr. Powers sitting on the floor with his back against the cell door with his legs stretched out on the floor.  Id.  He had a sock around his neck and did not show signs of life.  Id.  Sergeant Giles was called away about fifteen minutes after arriving at the Third District to question a female suspect in an unrelated incident.  Giles Dec at ¶ 9.  When she had finished, she returned to the officer processing room and heard the call over the radio about a non-responsive prisoner.  Id.

Officer Giles went back to the cell block and observed Mr. Powers leaning up against the cell door with socks around his neck and his head leaning to the side with his shirt up in back.  Giles Dec at ¶ 10.  He did not show any signs of life.  Id.  Third District officers called the EMS immediately, and they arrived within a few minutes.  Burdyn Dec at ¶ 16.

An autopsy was later performed on the remains of Mr. Powers.  Dr. Jonathan L. Arden, former Chief Medical Examiner for the District of Columbia, hired by Federal Defendants as a private consultant and expert forensic pathologist, has reviewed the autopsy report and associated evidence. Declaration of Jonathan L. Arden (hereinafter "Arden Dec"), attached hereto as Exhibit 4, at ¶¶ 1-3 and Exhibit A (Autopsy Report).  Dr. Arden has concluded that the allegations of the Complaint and Amended Complaint are not well-founded.  Concerning allegations that the bruising to Mr. Powers' back, buttocks and legs was consistent with inflicted blows and excessive force used upon him by police officer night sticks, he found these statements inaccurate in several ways. Id. at ¶ 4.  Mr. Powers had no injuries to his buttocks.  Id.  Secondly, a medical examiner is qualified to

interpret the features of injuries, *e.g.*, as to their type, mechanism and causation, but it is beyond the scope of forensic pathology to offer an opinion as to the use of "excessive force." Id.

As to the assertion that at least some of the injuries were consistent with having been inflicted by "police night sticks," am. compl. at ¶¶ 21, 24 & 41, none of the injuries documented on or in Mr. Powers's body by autopsy had any pattern suggestive of being struck with any particular type of object. Arden Dec at ¶ 5. Dr. Arden opined that

> A soft-tissue injury caused by striking with a cylindrical object, such as a police baton, typically recapitulates the configuration of the striking portion of the object, resulting in a rectangular or elongated bruise. In contrast, the bruise to the right shin was irregularly shaped. The injuries to the lower back and thighs consisted of areas of bleeding in the subcutaneous (under the skin) tissues; none of these had any patterned surface components, as would be likely if these were caused by strikes with a baton. The zones of subcutaneous hemorrhage were not described or diagramed to have any pattern; several of them theoretically are consistent with strikes by an elongated object, but their features do not suggest this to be more probable than being caused by impacts with another type of surface or object.

Id. Plaintiff's allegations of civil rights or constitutional violations appear to be based on little more than conjecture and speculation.

Dr. Arden reached the following additional noteworthy conclusions. The injury to the left side of the chest, described as a "dry yellow abrasion," is nothing more than a postmortem pressure mark, meaning that it does not represent an injury incurred by Mr. Powers while alive. Arden Dec at ¶ 6. The presence of a few, scattered, non-specific (*i.e.*, not patterned) bruises on the body of Mr. Powers does not permit an inference that he was struck with an object. Id. at ¶ 7. Most significantly, no evidence linked whatever "fresh" bruising was present to the police. There was no microscopic examination of any of the injuries, which might permit a more precise estimation of their ages. Id. at ¶ 8. Dr. Arden concludes that "some or all of them could have occurred prior to the time of Mr. Powers's arrest." Id. Further corroborating the view that Plaintiff's claims are speculative, Dr.

8

Arden also concludes that "[i]t cannot be established with reasonable medical certainty that any or all of [the bruises] occurred while [Mr. Powers] was in custody of law enforcement." <u>Id</u>.

Like his cause of death, no evidence suggests that Mr. Powers was not the cause of his own injuries. In fact, toxicology results revealed that Mr. Powers had high levels of alcohol and cocaine in his system at death, even after being in custody for nearly four hours, during which time he would have continued to metabolize the substances. Arden Dec at ¶ 10 and Exhibit A. Dr. Arden concluded that it is more probable that the combined effects of these substances diminished Mr. Powers' sensation of pain. <u>Id</u>. at ¶ 10. "In addition, the pharmacologic effects of cocaine would accelerate death by asphyxia and/or diminution of cerebral blood flow caused by hanging, although it is not reasonable to quantitate the magnitude of this in a particular instance." <u>Id</u>.

## II.    <u>STANDARD OF REVIEW</u>

### A.    **Dismissal for Lack of Subject Matter Jurisdiction**

"A motion under 12(b)(1) 'presents a threshold challenge to the court's jurisdiction.'" <u>Gardner v. U.S.</u>, No. CIV. A. 96-1467EGS, 1999 WL 164412, *2 (D.D.C. Jan. 29, 1999), <u>aff'd</u>, 213 F.3d 735 (D.C. Cir. 2000) and <u>cert. denied</u>, 531 U.S. 1153 (2001), <u>quoting, Haase v. Sessions</u>, 835 F.2d 902, 906 (D.C. Cir.1987). Specifically, "subject matter jurisdiction deals with the power of the court to hear [a] plaintiff's claims in the first place, and therefore imposes upon courts an affirmative

obligation to ensure that they are acting within the scope of their jurisdictional power."[1]  4 Wright

& Miller:  Federal Prac. & Proc. § 1350 (R12)(2002 Supplement).

A court may resolve a motion to dismiss for lack of subject matter jurisdiction under Rule

12(b)(1) in two ways.  First, the Court may resolve the motion based solely on the complaint.

Herbert v. National Academy of Science, 974 F.2d 192, 197 (D.C. Cir. 1992).  Alternatively, to

determine the existence of jurisdiction, or lack thereof, a court may look beyond the allegations of

---

[1] Plaintiff has failed to effect proper service of the Federal Defendants, requiring dismissal of this suit pursuant to Fed. R. Civ. P. 12(b) (2), (4) and (5).

Although Federal Defendants probably have little basis to challenge Plaintiff's method of service for purposes of his official capacity suit, Plaintiff clearly has failed to effect proper service for purposes of her individual capacity suit.  The Court lacks personal jurisdiction over the Federal Defendants due to the absence of proper service of process.  It is well-established that in an action against a federal employee in that employee's individual capacity, the Plaintiff must serve the defendant with process in accordance with rules applicable to individual defendants. See Simpkins v. District of Columbia Government, 108 F.3d 366, 369 (D.C. Cir. 1997); Lawrence v. Acree, 79 F.R.D. 669, 670 (D.D.C. 1978); Navy, Marshall & Gordon v. U.S. International Development-Corporation Agency, 557 F. Supp. 484, 489 (D.D.C. 1983); Delgado v. Bureau of Prisons, 727 F. Supp. 24 (D.D.C. 1989).

Fed. R. Civ. P. 4 requires that a copy of the summons and complaint be delivered to the defendant (or his appointed agent) personally, or be left "at his dwelling house or usual place of abode with some person of suitable age and discretion" who resides there.  Service on the Attorney General of the United States and the United States Attorney for the district in which the action is brought, pursuant to the rules applicable to official capacity suits, "does not obviate the requirement of personal service . . . where the action is in substance against a federal official in his individual capacity." Lawrence, 79 F.R.D. at 670; Delgado, 727 F. Supp. at 27.

Where, as here, Plaintiff seeks relief against a federal official in that official's individual capacity, the Court must acquire personal jurisdiction in order to enter a binding judgment, Ali v. District of Columbia, 278 F.3d 1, 7 (D.C. Cir. 2002); Reuber v. United States, 750 F.2d 1039, 1049 (D.C. Cir. 1984), overruled on other grounds by Kauffman v. Anglo-American School of Sofia, 28 F.3d 1223 (D.C. Cir. 1994); Griffith v. Nixon, 518 F.2d 1195 (2d Cir.), cert. denied, 423 U.S. 995 (1975), and the general rule is that a plaintiff has the burden of establishing personal jurisdiction. Reuber, supra at 1052.  Because the record in this action does not establish proper personal service upon the Federal Defendants in their individual capacities, see Id., any claim against them in their individual capacities is subject to dismissal.

the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. See Id. Courts have found dismissal of claims appropriate for lack of subject matter jurisdiction on the following grounds – lack of standing, failure to exhaust administrative remedies, and sovereign immunity. 4 Wright & Miller: Federal Prac. & Proc. § 1350 (R12) (2002 Supplement).

### B.    Dismissal for Failure to State a Claim

A motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Federal Rules") should be granted unless plaintiff's factual allegations are "enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007); see Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994). Though the plaintiff is given the benefit of all inferences that reasonably can be derived from the facts alleged in the complaint, the court need not accept inferences that are not supported by such facts, nor must the court accept plaintiff's legal conclusions cast in the form of factual allegations. Kowal, 16 F.3d at 1276.

### C.    Summary Judgment Standard

Summary judgment is appropriate when the record shows that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986); Tao v. Freeh, 27 F.3d 635, 638 (D.C. Cir. 1994). Accord, Scott v. Harris, ___ U.S. ___, 127 S.Ct. 1769, 1776 (2007). In determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. Id.;

Matsushita, 475 U.S. at 587.  The mere existence of a factual dispute, however, will not defeat summary judgment.  The non-moving party must show that the dispute is genuine and material to the case.  That is, the factual dispute must be capable of affecting the substantive outcome of the case and supported by sufficiently admissible evidence that a reasonable trier of fact could find for the non-moving party.  Anderson, 477 U.S. at 247-48; Laningham v. U.S. Navy, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).  If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted."  Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)).  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'"  Celotex Corp., 477 U.S. at 323 (citations omitted).

Mere conclusory allegations are not enough to survive a motion for summary judgment.  Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993); Rowland v. Riley, 5 F. Supp.2d 1, 3 (D.D.C. 1998); Benn v. Unisys Corp., 176 F.R.D. 2 (D.D.C. 1997).  Likewise, an affidavit which merely recites conclusory allegations will not defeat summary judgment.  See Lujan v. National Wildlife Federation, 497 U.S. 871, 888-89 (1990) ("The object of [Rule 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").  As the Supreme Court has instructed:  "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  "When opposing parties tell two different stories, one of which is **blatantly contradicted by the record**, so that no reasonable jury could believe it, a court should

12

not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott</u>,

___ U.S. ___, 127 S.Ct. at 1776 (emphasis added).

## **ARGUMENT**

### III.    PLAINTIFF'S SUIT AGAINST FEDERAL DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES IS NOT ACTIONABLE

#### A.    Plaintiff's Constitutional Claims Against the Individual Federal Defendants Are Not Viable.

In Count I, Plaintiff claims that the Federal Defendants, sued in their individual capacities,

violated her son's Fifth Amendment right as a pretrial detainee by showing deliberate indifference

to his safety and well being by unlawfully isolating him and intentionally failing to monitor him.

<u>Id</u>. at ¶¶ 44-46.  The evidence submitted by Defendants, however, establishes that these contentions

are conclusory and unfounded.  In fact, the declarations of Benita Giles ("Giles"), Michael Burdyn

("Burdyn"), and Robert J. Beres ("Beres") reveal that these assertions are based on mere

speculation.

#### 1.    Federal Defendants did not use excessive force against Mr. Powers.

Plaintiff claims that Federal Defendants Giles and Burdyn used "unreasonable and

unnecessary force," which was "the proximate cause of Mr. Powers' death and caused him to endure

great conscious pain and suffering."  Am. Compl. at ¶ 45.  Again, such a claim is speculative at best.

Plaintiff has no evidence that these officials used any force, so claims that they used unreasonable

or unnecessary force against Mr. Powers can only be characterized as what they are, the product of

imagination.  Furthermore, claims that these officials committed an act that caused either Powers'

death or his pain and suffering, again suggests fabrication.

It is plain from the accounts of Burdyn, Giles and Beres that Federal Defendants used no physical force on Powers at any time.  At no time during the arrest was the use of force against Powers necessary, and no physical force was used on him.  Burdyn Dec at ¶ 14; Giles Dec at ¶ 7.  The arrest of Mr. Powers was executed according to USSS/UD and MPD policies and procedures.  Id.

Plaintiff offers only speculation regarding this alleged excessive use of force.  See Am. Compl. at ¶ 1 ("Officers Giles and/or Brudyn used excessive force on Mr. Powers during his arrest and detention.  During the autopsy, contusions were identified on Mr. Powers that were consistent with being struck repeatedly with a night stick or similar weapon. Mr. Powers sustained injuries on his buttocks, back of legs, abdomen, back, shins, and fingers.  These contusions were recent bruising and were inflicted at or near the time that Mr. Powers was illegally stopped, searched, arrested and brought to the Third District.  Upon information and belief, these bruises were sustained during the arrest and detention by Officers Giles and/or Brudyn [sic].").  First, Sergeant Giles physically did not participate in the arrest of Mr. Powers.  She was not involved in stopping the vehicle or physically controlling him from the time of the stop or his arrest, until his detention at the Third District Station.  Plaintiff cannot provide any evidence showing that either Sergeant Giles, especially, or Officer Burdyn perpetrated an act that caused injury to Mr. Powers.  As the Court correctly noted in its March 2007 Memorandum Opinion, "there is no vicarious liability for constitutional violations." Mem. Op. at 15, citing, inter alia, Int'l Action Center v. United States, 365 F.3d 20, 27 (D.C. Cir. 2004); Arnold v. Moore, 980 F.Supp. 28, 35 (D.D.C. 1997).  And, Sergeant Giles did not have physical contact with Mr. Powers during his detention and arrest.

Moreover, as Dr. Arden concluded, "a medical examiner is qualified to interpret the features of injuries, *e.g.*, as to their type, mechanism and causation, but it is beyond the scope of forensic pathology to offer an opinion as to the use of 'excessive force.'" Arden Dec at ¶ 4.  Concerning the type, mechanism and causation of the bruises noted during the autopsy, Dr. Arden found that none of the injuries documented on or in Mr. Powers's body had any pattern suggestive of being struck with any particular type of object. Id. at ¶ 5.  Effectively, none of the defects to the skin mirrored the shape of a night stick or similar weapon, and since other plausible explanations were possible, a necessary conclusion could not be reached that the bruising resulted from use of such a weapon. Id.

Furthermore, there was no microscopic examination of any of the injuries, which might permit a more precise estimation of their ages.  Id. at ¶ 8.  Dr. Arden concluded that "some or all of them could have occurred prior to the time of Mr. Powers's arrest" and that "[i]t cannot be established with reasonable medical certainty that any or all of [the bruises] occurred while [Mr. Powers] was in custody of law enforcement." Id.  Plaintiff's claims to the contrary are clearly conclusory, and wholly without foundation.

### 2.     Plaintiff's Fifth Amendment Claim Stemming from Mr. Powers' Status as a Pretrial Detainee Is Not Actionable.

Plaintiff alleges that Federal Defendants violated Mr. Powers' Fifth Amendment rights as a pretrial detainee when they showed deliberate indifference to Mr. Powers' safety and well being by unlawfully isolating him and intentionally failing to monitor him.  Am. Compl. at ¶ 44.  Like Petitioner's previous allegations, this one has no evidentiary support.

In its March 28, 2007 Memorandum Opinion, this Court described the standard for proving claims brought under the Fifth Amendment for pretrial detainee suicides.  Mem. Op. at 13-14.  That

15

standard consists of two prongs: (1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety. Id. at 13 (citing Collins v. Seeman, 462 F.3d 757, 760-61 (7th Cir. 2006)).  In prison suicide cases, the first prong (the objective element) is met by virtue of the suicide itself, as "[i]t goes without saying that suicide is a serious harm." Id. (internal quotations omitted).  The second, subjective component of an Eighth Amendment (analogous to the Fifth Amendment on this issue) claim requires a dual showing that the defendant:  (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk.  Id.

Plaintiff has failed to show either of the two parts of the second prong (deliberate indifference).  Neither Sergeant Giles nor Officer Burdyn had received any indications that there was any risk, let alone a substantial one, that Mr. Powers would commit suicide. So, they did not disregard that risk.  Defendants displayed no deliberate indifference to Powers' safety and health but rather properly followed the appropriate procedures for detaining an arrestee.

The record now firmly establishes that Giles and Burdyn truly and reasonably believed that Mr. Powers was not suicidal.  Mr. Powers appeared calm, made no statements and took no actions suggesting that he was suicidal.  Burdyn Dec at ¶ 14; Giles Dec at ¶ 7; Beres Dec at ¶ 5.  Giles "observed nothing at the scene to indicate that Mr. Powers required special measures in his transport or detention." Id. at ¶ 16.

The subjective beliefs of Giles and Burdyn concerning Powers' lack of suicidal tendency cannot be disputed because the evidence amply supports these beliefs.  Plaintiff states that "Officers Giles and Brudyn [sic] . . . had knowledge of Mr. Powers' emotional condition and needs and

recklessly disregarded the excessive risk." Am. Compl. at ¶ 46. This bald assertion is contrary to the evidence which shows that Mr. Powers displayed no suicidal signs or ideation. In the initial stages of the traffic stop, Powers was calm but as events progressed, he became nervous and jumpy. Burdyn Dec at ¶ 9. He stated that it was his first arrest. Id. He was concerned about what would happen to the car because it belonged to his mother. Id. Burdyn, Giles, and the other officers at the scene suspected that Powers was under the influence of some illegal substance. Id. at ¶ 8; Giles Dec at ¶ 7; Beres Dec at ¶ 5. There was nothing unusual about Mr. Powers' mental state during the arrest and detention. Law enforcement officers regularly come into contact with persons under the influence of illegal substances. Many arrestees are nervous, especially during the first arrest. One would expect an arrestee also to be nervous if he was driving someone else's car. Far from being suicidal, Mr. Powers' mental state was unremarkable (almost routine) especially given the circumstances of his arrest.

Plaintiff alleges that Giles and Burdyn would know about Powers' mental state because he became nervous during their harsh and threatening interrogation of him. Am. Compl. at ¶¶ 18-20, 30. No such interrogation ever occurred. Contrary to Plaintiff's allegation that Powers was not "apprised of his constitutional rights" (Am. Compl. at ¶ 17), Officer Burdyn read Powers his rights. Burdyn Dec at ¶ 12. See also Giles Dec at ¶ 8 (Mr. Powers's Miranda Rights card was completed, and all rights were marked "yes."). Neither Giles nor Burdyn interrogated Powers while he was in custody at the Third District Station. See Burdyn Dec at ¶ 13; Giles Dec at ¶ 8. No immediate discussion with Mr. Powers was necessary because he had already admitted to possessing the cocaine. Giles Dec at ¶ 8. Therefore, Giles and Burdyn could not have established a subjective

17

knowledge of Plaintiff's suicidal state of mind from an interrogation of Mr. Powers. Thus, Plaintiff cannot establish the first part of prong two.

Giles' and Burdyn's actions fall far short of satisfying part two of the second prong of the test because they had no information that a heightened risk existed that Mr. Powers would commit suicide. The absence of heightened risk was further solidified by the fact that Giles and Burdyn did take precautions that were consistent with standard procedures to ensure the safety of a pretrial detainee. When Burdyn searched and secured Mr. Powers incident to his arrest, Officer Burdyn removed Powers' personal property, including his belt and jewelry. Burdyn Dec at ¶ 11; Giles Dec at ¶ ; Beres Dec at ¶ 5. Mr. Powers' boots were removed for inspection, then his belt and other personal belongings were taken from him to ensure his safety and the safety of the officers. Giles Dec at ¶ 6. Sergeant Giles inspected Sergeant Beres' cruiser before Mr. Powers was transported therein. Id. Mr. Powers was placed in the back seat of the cruiser in handcuffs then transported to the Third District Station of the Metropolitan Police Department for booking. Id. These searches of Powers were part of efforts to ensure the safety of all parties involved, particularly Mr. Powers.

Once Mr. Powers arrived at theThird District Police Station, police officers made additional efforts to ensure his safety. While waiting outside the cell block for the MPD officer to receive the prisoner, Officer Burdyn removed his handcuffs from Powers and had him stand against a wall. Burdyn Dec at ¶ 12. Officer Burdyn searched him again and found another zip bag with a white substance in the small coin pocket of his pants. Id. He walked him into the cell block when the MPD officer was ready. Id. Officers Brown and Burdyn then transferred Powers over to the 3rd District cell block officer, who also searched Mr. Powers. Id. This was the fourth search of Mr.

18

Powers in the brief time period from his arrest to his arrival at the Police Station. It is difficult to fathom how these repeated searches could constitute "intentional disregard."

Plaintiff alleges that the placement of Mr. Powers in an isolated cell was part of this intentional disregard of the risk of his suicide. <u>See</u> Am. Compl. at ¶ 32 ("Mr. Powers was placed in a jail cell, isolating him from general detainees. The view of the jail cell was partially blocked from view.). However, the USSS/UD generally and Officer Burdyn and Sergeant Giles specifically had no control over assigning his cell. Burdyn Dec at ¶ 13. The Third District officer assigned Mr. Powers a cell. <u>Id</u>.

Plaintiff asserts that Federal Defendants failed to check on Powers for "almost" a two hour period. Am. Compl. at ¶ 34 ("The failure or refusal to check on or otherwise observe Mr. Powers during this almost 2 hour period was in direct violation of the general orders, policies and procedures of the MPD."). This simply is untrue. Officer Burdyn returned to the cell block to obtain Mr. Powers' signature on the notice of impoundment 40 minutes to 1 hour after his last contact with him. Burdyn Dec at ¶ 15.

Each of Plaintiff's attempts to allege facts establishing a deliberate indifference to her son's safety fails. Neither Sergeant Giles nor Officer Burdyn had a reason to believe that Mr. Powers was suicidal. They took all necessary precautions to ensure that he did not have access to items that could endanger him. They had nothing to do with the assignment of the cell. A reasonable time lapsed between Burdyn's last contact with Mr. Powers and his suicide.

Plaintiff has failed to show that Giles and Burdyn were deliberately indifferent to Powers' safety. The risk of Powers' suicide was by no means "so obvious" and "so great as to make it highly probable that harm would follow." Indeed, the officers observed nothing to suggest that Powers was

suicidal. Burdyn Dec at ¶ 14; Beres Dec at ¶ 5; Giles Dec at ¶ 7 (Officer Giles "observed nothing

at the scene to indicate that Mr. Powers required special measures in his transport or detention.").

Giles and Burdyn dutifully observed the appropriate standard of care during the arrest and detention

of Terrence Anthony Powers. Plaintiff has, therefore, failed to satisfy the second prong of the

"deliberate indifference test" adopted by this Court in its March 28, 2006 opinion.  Accordingly, this

Court should dismiss Plaintiff's Fifth Amendment claims against Federal Defendants Giles and

Burdyn with prejudice or, alternatively, enter summary judgment in Federal Defendants' favor.

> **3.** **Even If Plaintiff's Constitutional Claims Are Deemed to be Viable, Federal Defendants Enjoy Qualified Immunity Against Individual Capacity Liability.**

The Supreme Court has stated in <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 817-18 (1982), that

"government officials performing discretionary functions generally are shielded from liability for

civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." <u>Id</u>., citing <u>Procunier v. Navarette</u>, 434 U.S.

555, 565, 98 S.Ct. 855, 861 (1978); <u>Wood v. Strickland</u>, 420 U.S.308, 322 (1975); <u>accord</u>, <u>Wilson</u>

<u>v. Layne</u>, 526 U.S. 603, 609 (1999); <u>Crawford-El v. Britton</u>, 523 U.S. 574, 587-88 (1998).

"'[C]learly established' for purposes of qualified immunity means that '[t]he contours of the right

must be sufficiently clear that a reasonable official would understand that what he is doing violates

that right.'" <u>Wilson</u>, 526 U.S. at 614-15, quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).

Without specifying what act was committed or what conduct was involved, Plaintiff makes a number

of baseless allegations against Federal Defendants for constitutional violations allegedly in violation

of Mr. Powers' rights.  However, Plaintiff's claims are based on little more than rank speculation,

stemming solely from evidence of injury to Mr. Powers' body, or other neutral items of evidence,

which cannot be traced to police misconduct. None of the claims advanced, however, set forth constitutional violations. Even accepting the allegations of the Complaint in a light most favorable to the Plaintiff, Plaintiff cannot establish that only USSS/UD officers or even only the police generally had responsibility for whatever caused the injury to Mr. Powers' body. Because Plaintiff cannot maintain that the Federal Defendants violated any of Mr. Powers' clearly established rights, the Federal Defendants should enjoy qualified immunity. Consequently, Plaintiff's claims should be dismissed, or the Court should enter judgment in favor of the Federal Defendants.[2]

Plaintiff's claims essentially encompass contentions that Sergeant Giles and Officer Burdyn were negligent in the manner in which Mr. Powers was confined. The D.C. Circuit, following the Supreme Court, has held nonetheless that "**mere negligence by governmental actors can never constitute a fifth amendment violation**." Committee of U.S. Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 948 (D.C. Cir. 1988) (emphasis added), interpreting Davidson v. Cannon, 474 U.S. 344, 347 (1986) and Daniels v. Williams, 474 U.S. 327, 334 (1986). The Fifth Circuit applied this principle under similar circumstances in Hare v. City of Corinth, Miss., 74 F.3d 633 (5th Cir. 1996).[3] There, the Court vacated the district court's denial of prison officials' summary judgment motion, advanced primarily on qualified immunity grounds, and remanded. The appeal involved a husband's suit against prison officials in their individual capacities under 42 U.S.C. §

---

[2] Moreover, individual liability for damages for violation of constitutional rights is predicated upon personal responsibility. Schultz v. Baumgart, 738 F.2d 231, 238 (7th Cir. 1984). Plaintiff's speculative claims cannot establish personal responsibility of the Federal Defendants. For the same reason, as well as failure to state a valid claim, Plaintiff's state-law equivalent claims also fail.

[3] The Seventh Circuit requires more than both ordinary negligence and gross negligence. See Hare, 74 F.3d at 645, relying on Salazar v. City of Chicago, 940 F.2d 233, 238 (7th Cir.1991).

1983 stemming from his wife committing suicide while in custody.  Interpreting the "deliberate indifference" standard, the Court concludes that more than negligence is required. <u>Id</u>. at 648-50.  The <u>Hare</u> Court ultimately determined that "the correct legal standard is not whether the jail officers 'knew or should have known,' [(which the district court there applied)] but whether they had gained **actual knowledge** of the substantial risk of suicide and responded with deliberate indifference." <u>Id</u>. at 650 (emphasis added).

Applying this standard to the facts here, it is abundantly clear that neither Sergeant Giles nor Officer Burdyn had actual knowledge of a suicide risk.  Plaintiff cannot establish that the circumstances suggested that Mr. Powers was suicidal.  As this Court recognized in its March 2003 Memorandum Opinion, government officials sued individually and asserting qualified immunity are entitled to early resolution of the defense and are entitled to dismissal of allegations that fail to state a violation of clearly established law. Mem. Op. at 16-17, citing <u>Saucier v. Katz</u>, 533 U.S. 194, 200-201 (2001) and <u>Behrens v. Pelletier</u>, 516 U.S. 299, 306 (1996).  The conclusory allegations advanced by Plaintiff here cry out for dismissal or judgment favoring Federal Defendants in view of this exacting standard.

### B. The Court Lacks Jurisdiction of Plaintiff's Common Law Claims.

In her "more definite statement," Plaintiff now attempts to advance claims against the individual Federal Defendants for the common law claims of intentional infliction of emotional distress and gross negligence in Counts II and III, respectively, for conduct occurring within the scope of their employment. Am. Compl. ¶ ¶ 51-57.  Plaintiff's decision to advance these claims is baffling in view of this Court's March 2007 opinion holding that such claims are governed by the

Federal Tort Claims Act (FTCA). Mem. Op. at 18-19. It does not appear that Plaintiff intended to advance an FTCA claim in her Amended Complaint, setting forth a more definite statement.

It is well-established that when a federal employee is sued for a wrongful or negligent act, the United States Attorney General, or by designation the United States Attorney in the district where the claim is brought (or his designee), may certify that the employee was acting at the time within the scope of his employment. See 28 U.S.C. § 2679(d)(1). Specifically, this statute provides:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1) (emphasis added). In short, where the Attorney General's designee has filed a certification that the original defendant was acting within the scope of his employment, such certification has the following two effects: (1) it requires the substitution of the United States for the federal employee as the defendant in the lawsuit; and (2) it converts the lawsuit into an action against the United States under the FTCA. See 28 U.S.C. §§ 1346(b), 2671 et seq.; see also Haddon v. United States, 68 F.3d 1420, 1423 (D.C. Cir. 1995); Vanover, 77 F. Supp.2d at 97.

Previously filed in support of Federal Defendants' initial motion to dismiss as Exhibit B was the December 7, 2006 Certification of Rudolph Contreras, Civil Chief, United States Attorneys Office for the District of Columbia, verifying that Sergeant Giles and Officers Burdyn, among others, were acting within the scope of their authority as employees of the United States at the time

23

of the suicide.  See R. 21.[4]  Accordingly, this suit becomes one against the United States under the

FTCA, not against the individual Federal Defendants.  See Haddon, 68 F.3d at 1423; Gustave-

Schmidt v. Chao, 226 F. Supp.2d 191, 200 (D.D.C. 2002).

The doctrine of sovereign immunity bars all suits against the United States except where

such immunity is expressly waived by Congress.  See United States v. Testan, 424 U.S. 392, 399

(1976).  The sovereign immunity of the United States protects it and its agencies from suit absent

an express waiver.  See FDIC v. Meyer, 510 U.S. 471, 484-86 (1994); United States v. Nordic

Village, 503 U.S. 30, 33-34 (1992) (waivers must be "unequivocally expressed"); United States v.

Mitchell, 445 U.S. 535, 538 (1980); Information Sys. & Networks Corp. v. United States

Department of Health & Human Servs., 970 F. Supp. 1, 3 (D.D.C. 1997) ("Defendants, as federal

agencies, are immune from suit unless the government has expressly waived that immunity.")

(citation omitted).

Sovereign immunity is jurisdictional.  As the Supreme Court has recognized, the "terms of

[the United States'] consent to be sued in any court define that court's jurisdiction to entertain the

suit."  United States v. Sherwood, 312 U.S. 584, 586 (1941); see also Alexander v. Americans

United, Inc., 416 U.S. 752, 767 n.5 (1974) (Blackmun, J., dissenting).  When a plaintiff seeks

monetary relief for torts against the United States or a department of the United States, the only

possible basis for relief is under the FTCA.  The FTCA authorizes district courts to hear suits against

the United States

> for money damages ... for injury or loss of property, or personal injury or death
> caused by the negligent or wrongful act or omission of any employee of the

---

[4] "R." refers to the docket number where the cited document appears in the record for this
case.

24

Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b); see also Cope v. Scott, 45 F.3d 445, 447 (D.C. Cir. 1995).

### C.    Plaintiff's Common Law Claims Also Fail Substantively

#### 1.    Plaintiff Cannot Establish Intentional Infliction

Apart from whether the Court has jurisdiction over Plaintiff's common law claims, these claims substantively are not actionable.  Concerning Count II, the intentional infliction of emotional distress claim, Plaintiff contends that Burdyn and Giles used unreasonable and unnecessary force; deliberately isolated Mr. Powers; and failed to observe him.  Compl. at ¶ 52.  These acts allegedly caused Mr. Powers to suffer anxiety and mental anguish, which ultimately resulted in his suicide. Id. at ¶ 53.  To prevail on a claim of intentional infliction of emotional distress, plaintiff must prove three elements: (1) defendant acted in an extreme and outrageous manner (2) which was intentionally or recklessly calculated (3) to cause plaintiff severe emotional distress.  Joyce v. U.S., 795 F. Supp. 1,  5 (D.D.C. 1992) (citing Green v. American Broadcasting Companies, Inc., 647 F.Supp. 1359, 1362 (D.D.C. 1986)).  Plaintiff cannot show that the Defendants' conduct was "extreme and outrageous."

To establish the required degree of "outrageousness," Plaintiff must allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Bernstein v. Fernandez, 649 A.2d 1064, 1075 (D.C. 1991) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)); see also Homan v. Goyal, 711 A.2d 812, 818 (D.C. 1998).  "A case of intentional infliction of emotional distress is made out only if the recitation of the facts to an average member of the

community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'"
Homan, 711 A.2d at 818 (quoting Restatement (Second) of Torts § 46 (1965)).  Even reading the
Complaint in a light most favorable to the Plaintiff, it clearly fails to allege sufficiently outrageous
conduct.  There was probable cause to arrest Powers.  He admitted to possessing the cocaine that
the Police found in the vehicle that he was driving.  Burdyn Dec at ¶ 6; Giles Dec at ¶ 4.  The
Washington Area Law Enforcement System revealed that his license was suspended in North
Carolina.  Burdyn Dec at ¶ 4; Giles Dec at ¶ 3.  At no time during the arrest was the use of force
against Mr. Powers necessary, and no physical force was used on him.  Burdyn Dec at ¶ 14; Giles
Dec at ¶ 7; Beres Dec at ¶ 5.  Arrests based on probable cause are usually not characterized as
"outrageous" under the law.  See Grabou v. May Dep't Stores, Inc., 462 A.2d 1102, 1103-05 (D.C.
1983) (rejecting claim for intentional infliction of emotional distress where store security guard's
arrest of a customer was based on probable cause and customer did not allege excessive force.  Jury
had acquitted the customer on a charge of petit larceny.).  See also, Jackson v. District of Columbia,
412 A.2d 948, 957 (D.C. 1980) ("The fact that an officer held a gun, even at close range, during an
arrest on **probable cause** for a felony charge is not in itself so far out of bounds that it can give rise
to an emotional distress claim.") (emphasis added).

     Federal Defendants' actions cannot be described as "outrageous" ("utterly intolerable in a
civilized society").  As previously discussed, the record clearly shows that Giles and Burdyn did not
commit any of the acts alleged by Plaintiff.  They did not use any physical force, let alone excessive
force.  Burdyn Dec at ¶ 14; Giles Dec at ¶ 7; Beres Dec at ¶ 5.  The USS/ UD had no control over
Powers' cell assignment.  Burdyn Dec at ¶ 13.  Giles and Burdyn did not intentionally expose
Powers' to risk of death when they completed the arrest paperwork while he was in his cell.  Powers

did not show any signs of being suicidal at any time during the arrest and detention.  Burdyn Dec at ¶ 14; Giles Dec at ¶ 7; Beres Dec at ¶ 5.  A time period of forty minutes to an hour elapsed between Burdyn's last contact with Powers and when he found him dead in his cell.  Burdyn Dec at ¶ 15.  This was certainly not an unreasonable amount of time given Powers' apparent ordinary mental state.  There is no evidence to show that Giles and Burdyn committed any act (intentional or otherwise) that would have caused Powers to "suffer[] anxiety and mental anguish to the degree that he committed suicide" (Am. Compl. at ¶ 53).

Although the Amended Complaint may state the necessary elements for "severe emotional distress" (suicide), the evidence of the other two elements necessary to prove a claim of intentional infliction of emotional distress (outrageous conduct and intentional or reckless causation) is clearly absent.  Accordingly, Federal Defendants are entitled to judgment on Plaintiff's claim for intentional infliction of emotional distress.

### 2.     Federal Defendants' Treatment of Powers While He Was in Their Custody Did Not  Constitute Gross Negligence.

In Count III, Plaintiff alleges that Giles and Burdyn's actions amounted to gross negligence because they "exhibited a wanton and reckless disregard for the rights of the decedent."  Am. Compl. at ¶ 55.  Plaintiff again restates her allegations that Giles and Burdyn deliberately isolated Mr. Powers and failed to monitor him.  Id. at ¶ 56.  As previously discussed, the evidence shows that Federal Defendants had no control over Powers' cell assignment and that they monitored him appropriately under the circumstances.

The District of Columbia Court of Appeals has defined gross negligence as conduct that:

requires such an extreme deviation from the ordinary standard of care as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others.  This standard has been held to connote that the actor has

27

engaged in conduct so extreme as to imply some sort of bad faith. Where ... there is no evidence of subjective bad faith on the part of the actor, the extreme nature of the conduct may be shown by demonstrating that the actor acted in such disregard of a risk "so obvious that [the actor] must be taken to be aware of it and so great as to make it highly probable that harm would follow."

District of Columbia v. Henderson, 710 A.2d 874, 876 (D.C. 1998) (discussing gross negligence in the context of D.C. Code § 1-1212, which renders the District of Columbia liable on claim arising from operation of emergency vehicle ).

Sergeant Giles' and Officer Burdyn's conduct did not constitute gross negligence. Their arrest and detention of Powers did not constitute an "extreme deviation from the ordinary standard of care as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others." Under the circumstances, they took all necessary precautions to ensure that Powers was not a threat to himself. Mr. Powers did and said nothing to indicate that he was suicidal. See Burdyn Dec at ¶ 14; Giles Dec at ¶ 7; Beres Dec at ¶ 5. Presented with the commonplace situation of stopping a motorist who appears to be under the influence of narcotics, Giles and Burdyn acted prudently. Powers' belt and jewelry were removed to ensure the safety of himself and the officers. Burdyn Dec at ¶ 11; Giles Dec at ¶ 5; Beres Dec at ¶ 5, Burdyn Dec at ¶ 11; Giles Dec at ¶ 6; Beres Dec at ¶¶ 3-4. His boots were removed for inspection. Burdyn Dec at ¶ 11; Giles Dec at ¶ 6; Beres Dec at ¶¶ 3-4. Sergeant Giles inspected Sergeant Beres's cruiser before Mr. Powers was transported therein. Id. After Powers arrived at the sallé port, Officer Burdyn had him stand up against the wall while he searched him again. Burdyn Dec at ¶ 12. During this search, Burdyn found a zip bag containing white substance in his coin pocket. Id. Contrary to showing a willful and reckless disregard or conscious indifference for the rights and safety of others,

28

Giles' and Burdyn's conduct reflect the diligent efforts of law abiding officers to ensure Mr. Powers' safety.

There is no evidence that Giles or Burdyn possessed subjective bad faith, and the evidence establishes that they did not disregard a risk "so obvious that [they] must be taken to be aware of it and so great as to make it highly probable that harm would follow." See Henderson, 710 A.2d at 876. Plaintiff accuses Federal Defendants of deliberately isolating Mr. Powers and thereafter failing to monitor him. Am. Compl. at ¶¶ 52, 55. Once again, both claims are baseless. Giles and Burdyn had no authority to assign a cell to Mr. Powers because the USSS/UD has no control over that process. Burdyn Dec at ¶ 13. Powers was appropriately monitored under the circumstances. The risk of Powers' suicide was by no means "so obvious" and "so great as to make it highly probable that harm would follow." Indeed, the Officers observed nothing to suggest that Mr. Powers was suicidal. Burdyn Dec at ¶ 14; Beres Dec at ¶ 5; Giles Dec at ¶ 7 (Officer Giles "observed nothing at the scene to indicate that Mr. Powers required special measures in his transport or detention."). Giles and Burdyn dutifully observed the appropriate standard of care during the arrest and detention of Terrence Anthony Powers. Accordingly, Plaintiff's claim of gross negligence should be dismissed or judgment entered in favor of the Federal Defendants.

## IV.   **CONCLUSION**

WHEREFORE, Federal Defendants respectfully submit that this Renewed Motion to Dismiss or, in the Alternative, Motion for Summary Judgment should be granted.


Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/_____
OLIVER W. McDANIEL, D.C. Bar #377360
Assistant United States Attorneys
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 616-0739

Counsel for Federal Defendants

June 22, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this  22nd  day of June, 2007, I caused the foregoing Federal

Defendants' Renewed Motion to Dismiss or, in the Alternative, Motion for Summary Judgment,

Memorandum of Points and Authorities in Support Thereof, with Exhibits, Statement of Material

Facts Not in Genuine Dispute, and proposed order, to be served on Counsel for the Plaintiff and

Counsel for the District of Columbia Defendants by the Electronic Case Filing system or, if this

means fails, then by mail, postage prepaid, addressed as follows:


M. Celeste Bruce, Esq.
Rifkin, Levingston, Levitan & Silver, LLC
6305 Ivy Lane, Suite 500
Greenbelt, MD 20770

Dana K. DeLorenzo
Assistant Attorney General
Office of the Attorney General for the
  District of Columbia
441 4th Street, N.W., Sixth Floor South
Washington, D.C. 20001


                                        /s/
                         _____
                         OLIVER W. MCDANIEL, D.C. BAR # 377360
                         Assistant United States Attorney
                         Civil Division
                         555 Fourth Street, N.W.
                         Washington, D.C.  20530
                         (202) 616-0739