UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PATRICIA A. POWERS-BUNCE<br><br>Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>) Civil Action No. 06-1586 (RMC)<br>)<br>)<br>)<br>)<br>) |

**FEDERAL DEFENDANTS'**
**STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

In accordance with Local Civil Rule 7.1(h), Federal Defendants hereby submit this Statement of Material Facts as to which there is no genuine dispute.

### The Arrest

1.      On July 15, 2004, Officer Michael Burdyn of the Uniformed Division of the U.S. Secret Service (hereinafter "USS/UD') was on patrol. Declaration of Michael Burdyn, June 15, 2007 (hereinafter "Burdyn Dec.") at ¶ 2. He had begun his shift at 10:30 p.m. the previous day. Id. His shift was scheduled to end at 7:00 a.m. Id. At around 12:30 a.m., he observed a black Mazda Miata with Maryland license plate #HXB066, traveling eastbound on Massachusetts Ave., N.W., drive through a red traffic signal at the intersection of Mass. Ave. and Dupont Circle. Id. Officer Burdyn stopped the Mazda for the traffic violation at 00:39 a.m. in front of 1776 Massachusetts Ave., N.W. Id. He radioed in the stop and waited for backup to arrive. Id.

2.      Officer Ray McQueen of the USSS/UD arrived at 00:40 a.m. Burdyn Dec. at ¶ 3. Officer Burdyn and McQueen approached the vehicle. Id. Officer Burdyn positioned himself at the driver's window, and Officer McQueen positioned himself on the passenger's side of the car. Id.

Officer Burdyn identified himself and explained to Mr. Terence Anthony Powers, the driver, that he stopped the car because Mr. Powers failed to stop at the red light. Id. Officer Burdyn asked Mr. Powers for his driver's license, vehicle registration, and proof of insurance. Id. Mr. Powers handed him a North Carolina driver's license and a registration for the Mazda. Id. Officer Burdyn returned to his patrol cruiser. Id.

   3. Officer Burdyn checked Mr. Powers's driver's license through the Washington Area Law Enforcement System and it revealed that his license was suspended in North Carolina. Burdyn Dec. at ¶ 4; Declaration of Benita Giles, June 15, 2007 (hereinafter "Giles Dec.") at ¶ 3.

   4. While Officer Burdyn was at his cruiser, Officer McQueen, was positioned next to the passenger's side of the car. Burdyn Dec. at ¶ 5. Officer McQueen observed Mr. Powers reach behind the front passenger's seat with his right hand and remove an unknown object. Id. He then observed Mr. Powers manipulating that object, which Mr Powers placed in the map pocket. Id. Officer McQueen suspected that it could be a weapon so he asked Mr. Powers for the box, and asked Mr. Powers out of the car. Id.

   5. Officer Burdyn returned to the car and took control of Mr. Powers while Officer McQueen examined the object in the map pocket, which was a cigarette box. Burdyn Dec. at ¶ 5. Inside the box, Officer McQueen found five one-inch by one-inch plastic bags containing a powdered white substance. Id.; Giles Dec. at ¶ 4. He then handed the box to Officer Burdyn. Burdyn Dec. at ¶ 5.

   6. When Sergeant Benita Giles of the USS/UD arrived on the scene, Officers Burdyn and McQueen had Mr. Powers out of the black Mazda Miata that he was driving. Giles Dec. at ¶

3. As per her duties, Sergeant Giles had been dispatched to the scene to serve as the supervising official. Id. at ¶ 2.

7. Mr. Powers admitted that the bags belonged to him. Burdyn Dec. at ¶ 6; Giles Dec. at ¶ 4.

8. Mr. Powers said that he had been at a club on P street, but he could not give the name of the club. Burdyn Dec. at ¶ 7. He explained that he saw another car run the red light, so he decided to as well. Id. However, no other cars were around at the time. Id.

9. Mr. Powers denied any alcohol consumption. Burdyn Dec. at ¶ 8. He did not slur his words. Id. Officer Burdyn did not smell any alcohol on his breath. Id. Officer Burdyn, along with the other officers at the scene, did suspect that he was under the influence of some illegal substance. Id.; Giles Dec. at ¶ 7; Declaration of Robert J. Beres, June 18, 2007 ("Beres Dec."), at ¶ 5.

10. At the beginning of the stop Mr. Powers was calm. Burdyn Dec. at ¶ 9. He became jumpy and nervous as the arrest progressed. Id. He said that it was his first arrest. Id. He was concerned about what would happen to the Mazda, which he said belonged to his mother. Id. The car was later impounded for safekeeping and not because of the crime. Id.

11. Crime Scene Technicians Cockrell and Ortiz arrived at the scene. Burdyn Dec. at ¶ 10. They tested the substance in the bags, and it tested positive for cocaine. Id.; Giles Dec. at ¶ 4. They took possession of the five bags of cocaine. Id.

12. Officer Burdyn placed Mr. Powers under arrest for Possession with Intent to Distribute Cocaine and for driving without a valid driver's license. Burdyn Dec. at ¶ 11; Giles Dec.

at ¶ 5. Mr. Powers was handcuffed, searched incident to arrest, and his personal property was removed, including his belt and jewelry. Id. ; Beres Dec. at ¶ 5.

      13.    Sergeant Robert J. Beres arrived to transport Mr. Powers to the Third District Metropolitan Police Station. Giles Dec. at ¶ 6; Beres Dec. at ¶ 3. Sergeant Beres patted down Mr. Powers before he was placed in the cruiser for transport. Id.; Beres Dec. at ¶ 4. Mr. Powers's boots were removed for inspection, then his belt and other personal belongings were taken from him to ensure the safety of himself and the officers. Giles Dec. at ¶ 6. Sergeant Giles inspected Sergeant Beres's cruiser before Mr. Powers was transported therein. Id.; Beres Dec. at ¶ 4. Mr. Powers was placed in the back seat of the cruiser in handcuffs then transported to the Third District Station of the Metropolitan Police Department for booking. Burdyn Dec. at ¶ 11; Giles Dec. at ¶ 6; Beres Dec. at ¶ 4.

## The Detention

      14.    When Sergeant Beres returned arrived at the Third District Station, he took Mr. Powers into the station and turned him over to MPD Officers in charge of the Third District cellblock and left the station. Beres Dec. at ¶ 6. Officers Brown and Burdyn and assumed control over Mr. Powers when he arrived at the 3rd District Station sallé port. Burdyn Dec. at ¶ 12. Officer Burdyn read Powers his rights. Id. While waiting outside the cell block for the MPD officer to receive the prisoner, Officer Burdyn removed his handcuffs from Powers and had him stand against a wall. Id. He walked him into the cell block when the MPD officer was ready. Id. Officer Burdyn searched him again and found another zip bag with a white substance in the small coin pocket of his pants. Id. Officers Brown and Burdyn then transferred Powers over to the 3rd District cell block officer, who also searched Mr. Powers. Id.

15. The 3rd District officer assigned Mr. Powers a cell. Burdyn Dec. at ¶ 13. The USSS/UD has no control over that function. Id. Officer Burdyn accompanied Mr. Powers, along with the MPD cell block officer, back to the cell. Id. Mr. Powers did not make a request to use the phone. Id. Officer Burdyn then went to the officer processing room at the 3rd District to finish the arrest paperwork with Officer Brown. Id.

16. At no time during the arrest was the use of force against Mr. Powers necessary, and no physical force was used on him. Burdyn Dec. at ¶ 14; Giles Dec. at ¶ 7; Beres Dec. at ¶ 5 ("Mr. Powers was compliant when being transported, and no use of force was required by any officer at the scene to control him, and no force was used on Mr. Powers during the transport."). The arrest of Mr. Powers was executed according to USSS/UD and MPD policies and procedures. Id.. Mr. Powers showed no indications that he could not be left alone in a cell or that he was a threat to himself. Id. He did not talk during transport. Beres Dec. at ¶ 5. Mr. Powers appeared calm and made no statements and took no actions suggesting that he was suicidal. Burdyn Dec. at ¶ 14; Beres Dec. at ¶ 5; Giles Dec. at ¶ 7 (Officer Giles "observed nothing at the scene to indicate that Mr. Powers required special measures in his transport or detention.").

17. Sergeant Giles arrived at the 3rd District Station after Mr. Powers had been taken back for booking, and Sergeant Giles had no contact with him. Giles Dec. at ¶ 8. She went to the officer processing room to set up the laptop computer. Id. As the supervising official, she was responsible for completing the arrest paperwork. Id. Sergeant Giles entered information into the computer as told to her by Officer Burdyn, and assisted him and Officer Brown with completion of the arrest paperwork. Id. Mr. Powers's Miranda Rights card was completed and all rights were marked "yes." Id. Also, no immediate discussion with Mr. Powers was necessary because he had

already admitted to possessing the cocaine.  Id.  Sergeant Giles directed Officer Burdyn to obtain Mr. Powers's signature on the impoundment notice of his mother's Mazda.  Id.

## The Suicide

18. Officer Burdyn returned to the cell block to obtain Mr. Powers's signature on the notice of impoundment 40 minutes to 1 hour after his last contact with him.  Burdyn Dec. at ¶ 15.  He found Mr. Powers sitting on the floor with his back against the cell door with his legs stretched out on the floor.  Id.  He had a sock around his neck and did not show signs of life.  Id.

19. Sergeant Giles was called away about fifteen minutes after arriving at the Third District to question a female suspect in an unrelated incident.  Giles Dec. at ¶ 9.  When she finished, she returned to the officer processing room and heard the call over the radio about a nonresponsive prisoner.  Id.

20. Officer Giles went back to the cell block and saw Mr. Powers leaning up against the cell door with socks around his neck and his head leaning to the side with his shirt up in back.  Giles Dec. at ¶ 10.  He did not show any signs of life.  Id.

21. Third District officers called the EMS immediately, and they arrived within a few minutes.  Burdyn Dec. at ¶ 16.

## Autopsy Results

22. The Office of the United States Attorney for the District of Columbia retained Jonathan L. Arden, M.D., to provide consultation in the field of forensic pathology in this case.  Declaration of Jonathan L. Arden, M.D., June 20, 2007 (hereinafter "Arden Dec.") at ¶ 2.

23. Dr. Arden has practiced forensic pathology for more than twenty (20) years.  Arden Dec. at ¶ 1.  He was certified in both anatomic and forensic pathology by the American Board of

Pathology in 1985. Id. He spent most of his career as a government-employed medical examiner, including nine years with the Office of Chief Medical Examiner for the City of New York where he finished as First Deputy Chief Medical Examiner, and more than five years as Chief Medical Examiner of Washington, D.C. Id. Dr. Arden is currently president of Arden Forensics, PC, a consulting practice in forensic pathology and medicine. Id.

24.    Dr. Arden was provided with the following materials to review in connection with this matter: (1) Autopsy Report of Terence Anthony Powers from the Office of the Chief Medical Examiner, District of Columbia, Case Number 04-1745, including related body diagram and autopsy notes, and Toxicology Report; (2) Civil Complaint, Case No. 5391-06, Superior Court for the District of Columbia, Civil Division; (3) Notice of Claim (Standard Form 95); (4) United States Secret Service, Uniformed Division, Arrest/Prosecution Report, Citation Number 540400165; and (5) Declaration of Officer Michael Burdyn, Civil Action No. 06-1586 (RMC). Arden Dec. at ¶ 3. He also reviewed all autopsy photographs at the Office of the Chief Medical Examiner. Id. Of these photographs, twenty-one (21) were selected for printing. Id. Dr. Arden received copies of those photographs for his file. Id.

25.    Dr. Arden expressed his opinions with reasonable medical certainty. Arden Dec. at ¶ 11. He reserved the right to amend any statements or opinions offered if presented with additional significant evidence. Id.

26.    Paragraph 26 states "An independent medical examiner found that some of the bruising to Mr. Powers' back, buttocks and legs was consistent with inflicted blows and excessive force used upon him by police officer night sticks." Pacer Dkt. 1 at Attachment #2 at 7; Arden Dec. at ¶ 4. Dr. Arden found Paragraph 26 to be "inaccurate in several ways." Arden Dec. at ¶ 4. First,

Mr. Powers had no injuries to his buttocks. Id. Second, a medical examiner is qualified to interpret the features of injuries, e.g., as to their type, mechanism, and causation, but it is beyond the scope of forensic pathology to offer an opinion as to the use of "excessive force." Id.

27. As to the assertion that at least some of the injuries were consistent with having been inflicted by "police nightsticks," none of the injuries documented by autopsy on or in Mr. Powers's body had any pattern suggestive of being struck with any particular type of object. Arden Dec. at ¶ 5. A soft-tissue injury caused by striking with a cylindrical object, such as a police baton, typically recapitulates the configuration of the striking portion of the object, resulting in a rectangular or elongated bruise. Id. In contrast, the bruise to the right shin was irregularly shaped. Id. The injuries to the lower back and thighs consisted of areas of bleeding in the subcutaneous (under the skin) tissues; none of these had any patterned surface components, as would be likely if these were caused by strikes with a baton. Id. The zones of subcutaneous hemorrhage were not described or diagrammed to have any pattern (see autopsy report with notes, diagram and toxicology report, attached hereto as Exhibit A to Arden Declaration); several of them theoretically are consistent with strikes by an elongated object, but their features do not suggest this to be more probable than being caused by impacts with another type of surface or object. Id.

28. The injury to the left side of the chest described as a "dry yellow abrasion" is a postmortem pressure mark. Arden Dec. at ¶ 6. It does not represent an injury incurred by Mr. Powers while alive. Id. Although the autopsy report also describes a bruise in the soft tissues below this mark, the autopsy photographs do not demonstrate this convincingly. Id. If such a bruise did exist, then it is another non-specific injury that is indicative of localized impact, without any pattern

suggestive of being caused by an object such as a baton.  Id.  Regardless, the presence of this bruise does not obviate the opinion that the yellow mark is a postmortem artifact, not an injury.  Id.

29.    The presence of a few, scattered, non-specific (i.e., not patterned) bruises on the body of Mr. Powers does not permit an inference that he was struck with an object.  Arden Dec. at ¶7.

30.    No microscopic examination was performed on any of the injuries, which might permit a more precise estimation of their ages.  Arden Dec. at ¶ 8.  While it appears that these were "fresh" injuries by gross examination at autopsy, some or all of them could have occurred prior to the time of Mr. Powers's arrest.  Id.  It cannot be established with reasonable medical certainty that any or all of them occurred while he was in custody of law enforcement.  Id.

31.    None of the blunt injuries incurred by Mr. Powers caused damage to vital structures, nor fractures to any bones.  Arden Dec. at ¶ 9.  While they likely would have caused him some pain, there is no evidence on which to base a conclusion with reasonable medical certainty that he did actually experience "great conscious pain and suffering."  Id.

32.    Postmortem toxicologic testing revealed that Mr. Powers had substantial concentrations of ethanol (alcohol) and cocaine in his system at death, even after being in custody for nearly four hours, during which time he would continue to metabolize them (see Arden Dec., Exhibit A.).  Arden Dec. at ¶ 10.  If these substances were exerting a significant effect on Mr. Powers while he was in custody and when he hanged himself, then it is more probable that their combined effects diminished his sensation of pain.  Id.  In addition, the pharmacologic effects of cocaine would

accelerate death by asphyxia and/or diminution of cerebral blood flow caused by hanging, although it is not reasonable to quantitate the magnitude of this acceleration in a particular instance. Id.

        Respectfully submitted,

        /s/
        JEFFREY A. TAYLOR, D.C. Bar # 498610
        United States Attorney

        /s/
        RUDOLPH CONTRERAS, D.C. Bar #434122
        Assistant United States Attorney

        /s/
        OLIVER W. McDANIEL, D.C. Bar #377360
        Assistant United States Attorney
        Civil Division
        555 4th Street, N.W.,
        Washington, D.C. 20530
        (202) 616-0739

        Counsel for Federal Defendants

June 22, 2007