IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PATRICIA A. POWERS-BUNCE, Individually, | * | |
| And as Personal Representative of the | * | |
| ESTATE OF TERENCE ANTHONY POWERS | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No. 06-1586 (RMC) |
| | * | |
| DISTRICT OF COLUMBIA, *et al.* | * | |
| | * | |
| Defendants. | * | |
| _____ | * | |

**OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS, OR IN THE
ALTERNATIVE FOR SUMMARY JUDGMENT, AND PLAINTIFFS' MOTION FOR
DISCOVERY UNDER RULE 56(f)**

COMES NOW Plaintiff Patricia A. Powers-Bunce, Individually, and as Personal

Representative of the Estate of Terence Anthony Powers, and hereby Opposes Federal

Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment.  A Memorandum

of Points and Authorities in Support of Plaintiff's Opposition and Motion for Discovery under

Rule 56(f) is attached hereto and incorporated herein.

Respectfully Submitted,

Rifkin, Livingston, Levitan & Silver, LLC

/S/

_____

M. Celeste Bruce, Esquire
Bar No.: 438343

Ellen B. Flynn, Esquire
Bar No.: 465355

6305 Ivy Lane, Suite 500
Greenbelt, Maryland 20770

(301) 345-7700 phone
(301) 345-1294 facsimile

Dated:     July 3, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PATRICIA A. POWERS-BUNCE, Individually, | * | |
| And as Personal Representative of the | * | |
| ESTATE OF TERENCE ANTHONY POWERS | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No. 06-1586 (RMC) |
| | * | |
| DISTRICT OF COLUMBIA, *et al.* | * | |
| | * | |
| Defendants. | * | |
| _____ | * | |

**MEMORANDUM IN OPPOSITION TO FEDERAL DEFENDANTS'
MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY
JUDGMENT AND MOTION FOR DISCOVERY PURSUANT TO RULE 56(f)**

Plaintiff, Patricia A. Powers-Bunce, by and through counsel, respectfully submits this

memorandum of Points and Authorities in support of her Opposition to Federal Defendants'

Motion to Dismiss, or in the alternative, Motion for Summary Judgment.  In addition Plaintiff

Moves for discovery pursuant to Rule 56(f) and provides the Declaration of Max Krupo in

support of Plaintiffs' Opposition and Motion.

**I.      Introduction.**

This case is about compound civil rights violations which ultimately resulted in the death

of Mr. Powers.  It is the Plaintiff's allegation that Defendants' conducted an unlawful stop,

unlawful search, unlawful detainment without properly bringing charges or even processing Mr.

Powers, inflicted physical injuries on Mr. Powers while he was in custody, and failed to the

follow police procedure which was designed to protect detainees and could have saved Mr.

Powers' life and protected him from injury.

Plaintiff's Complaint for Violation of Civil Rights, Other Causes of Action and Damages ("the Complaint") was filed on July 14, 2006 in the Superior Court for the District of Columbia. After District and Federal Defendants filed Motions to Dismiss the Complaint, this Honorable Court issued an extensive Order on March 28, 2007 which denied in part the District Defendants' Motion and invited the Plaintiff to provide a more definite statement on certain Counts of the Complaint.   Plaintiff filed the First Amended Complaint in order to provide the more definite statement in compliance with the Court's Order on April 16, 2007.  On June 22, 2007, District Defendants filed a Motion to Dismiss and/or for Summary Judgment that raises many of the same arguments already addressed by the Court.  Despite the fact that Plaintiff has not been afforded discovery, Federal Defendants continue to raise factual issues and request that this Court decide the merits of this case without the benefit of discovery and a complete record. Federal Defendants have attached to their Motion to Dismiss or for Summary Judgment, the self-serving declarations of three officers, as well as an expert report.  The depositions of these Officers have not been offered as no discovery has proceeded in this matter and no discovery order has been issued.  Defendants apparently believe that Plaintiff should not be afforded the opportunity to fully examine, challenge and investigate these newly created self-serving statements through the discovery process.

II.    **Factual Disputes:**

The Federal Defendants have provided in support of their Renewed Motion to Dismiss, or in the alternative, Motion for Summary Judgment, Federal Defendants' Statement of Material Facts Not in Genuine Dispute.   This Statement purports to recount the facts associated with the arrest according to three declarations of Officers involved in the arrest that have yet to be cross-examined or deposed, and have yet to be required to respond to discovery.  Nonetheless, the

4

Statement is contested by Plaintiff's Declaration of Max Krupo provided herewith at Exhibit No.

1. While Plaintiff believes it is inappropriate to essentially require Plaintiff to produce her expert

witnesses at this stage in the proceedings before Plaintiff has been afforded any opportunity to

examine the Officers on the veracity of their self-serving and recently produced statement, and

without an opportunity to examine critical evidence in this case, in an abundance of caution the

Declaration of Max Krupo is provided to highlight the inconsistencies and inaccuracies in the

positions taken by Defendants in this matter. Mr. Krupo has reviewed the police record as well

as the recently generated declarations.

Officer Burdyn's explanations concerning the stop are highly unusual. The Incident

Based Event Report authored by Officer Burdyn indicates that Mr. Powers was initially observed

operating his vehicle eastbound in the "Unit block of Mass Ave. NW". Then he was observed

passing a red light at the intersection of "Mass Ave. and Dupont Circle", and a traffic stop was

effected in front of "1776 Mass Ave. NW". If this is correct the address for the traffic stop

would have been 17 blocks from the initial sighting of Mr. Powers. Further, if he was traveling

eastbound this would be inconsistent with him having traveled from the "Unit Block of Mass

Ave" since this location is 17 blocks to the east. See, Declaration of Max Krupo at ¶ 4.

Strangely absent from Officer Burdyn's declaration is any mention of where his initial

observations occurred.

In paragraph 2 of his declaration Officer Burdyn indicates that he observed Mr. Powers

pass a red light at "12:30 AM" and then he effected a traffic stop at "00:39. This would be nine

minutes after he observed the violation and only one and one half blocks away. This is a very

long time to effect a traffic stop after observing the violation. Conditions permitting, Officers

generally stop traffic violators immediately (conditions permitting) upon observing the violation

in order to limit the additional risk to the violators and others on the road. Nine minutes is a very long time between the observation and the stop, especially given the hour of the day. This is inconsistent with normal police operations and no justification is provided by Officer Burdyn for this lapse of time. *See, Declaration of Max Krupo at ¶ 5.*

In paragraph 5 of his declaration, Officer Burdyn purports to testify from specific knowledge the observations of another officer, Officer McQueen. Officer Burdyn indicates that while Burdyn was at the cruiser, Officer McQueen observed from his vantage point beside Mr. Powers' vehicle that Mr. Powers reached behind the front passenger's seat with his right hand and removed an unknown object and placed it back in the map pocket. Officer Burdyn's declaration then states that "Officer McQueen suspected that it could be a weapon" Officer Burdyn could not have known what Officer McQueen observed or his immediate conclusion concerning a weapon. Further, had Officer Burdyn and/or Officer McQueen suspected that Mr. Powers had a weapon, it should have been documented in the Incident Based Event Report. *See, Declaration of Max Krupo at ¶ 6.* Absent an opportunity to depose or examine Officer McQueen, it is not possible to determine whether Officer Burdyn's recitation of the impressions of Officer McQueen is accurate and complete. Furthermore, the actions of the Officers following this alleged suspicion of a weapon are inconsistent with an actual belief that Mr. Powers had a weapon. In paragraph 5 of his declaration, Officer Burdyn states "Officer McQueen asked Mr. Powers for the box, and asked Mr. Powers out of the car. I returned to the car and took control of Mr. Powers while Officer McQueen examined the object in the map pocket." Since Mr. Powers was now under direct police control and the "box" was in the map pocket of the vehicle, there was clearly no present danger to any of the officers on the scene. Based on this statement it is clear that Mr. Powers was under custodial control by the police

officers and that he was not asked for nor did he grant permission to search his vehicle. *See, Declaration of Max Krupo at ¶ 7.* At this point Officer McQueen did not observe a weapon or any type of contraband in plain view and therefore he lacked reasonable suspicion or probable cause to search Mr. Powers' vehicle. *Id.* Officer McQueen did not possess any articulable and particularized belief that would support his actions; he was operating on bare suspicion which is clearly prohibited unconstitutional conduct. *Id.*

In paragraph 11 of his declaration Officer Burdyn states that he searched Mr. Powers incident to his arrest on the scene and then in Paragraph 12 Officer Burdyn states that once at the Metropolitan Police Department Third District station he again searched Mr. Powers and found another zip bag with a white substance in his small coin pocket of his pants. This evidence should have been discovered at the scene of the arrest. *See Declaration of Max Krupo at ¶ 8.* Regardless of what was found in Mr. Powers' vehicle on the scene, if there was any concern by the officers that he may have possessed a weapon, for the safety of the officers a more thorough search would have been conducted on the scene. *Id.* The lack of a thorough search of Mr. Powers on the scene of the arrest indicates that in fact the Officers were not worried about any type of weapon. *Id.*

In paragraph 4 of his declaration Sergeant Benita Giles, USSU/UD states "Mr. Powers had handed the officers a cigarette box which contained five small zip bags, filled with a powdered white substance, which he admitted were his." This statement is in direct conflict with Paragraph 5 of the declaration of Officer Burdyn which would suggest that either Sergeant Giles or Officer Burdyn's statement is inaccurate.

In paragraph 6 of the declaration of Sergeant Benita Giles states that Mr. Powers was "patted down" before being placed in Sergeant Beres's cruiser for transport. This is in conflict

with paragraph 11 of Officer Burdyn's declaration, wherein he states that he "searched" Mr. Powers. A "pat down" is a lesser search of a prisoner and is usually reserved for a stop and frisk situation on the street. *See Declaration of Max Krupo at ¶ 10.* When a prisoner is transported and there has been any suspicion of a weapon (justified or not) a more thorough and complete search is required. *Id.* This "pat down" indicates that the Officers did not suspect Mr. Powers of possessing a weapon contrary to the assertions of Officer Burdyn. *Id.*

In paragraph 6 of his declaration Lieutenant Robert Beres, USSS/UD states that "When we arrived at the 3rd District Station, he took Mr. Powers into the station and turned him over to MPD Officers in charge of the Third District cellblock and left the station" This is in direct conflict with the paragraph 12 of the declaration of Officer Burdyn wherein he states "While waiting outside the cell block for the MPD officer to receive the prisoner, I removed my handcuffs from Mr. Powers and had him stand against a wall. I walked him into the cell block when the MPD Officer was ready". There is no mention by Officer Burdyn of Lieutenant Beres being involved in the physical transfer of Mr. Powers to the Third District cellblock personnel. These two statements are in such conflict that it is impossible at this time to determine who transferred custody of Mr. Powers for the USSS to the MPD. In addition, lacking from the statements are the communications between USSS concerning Mr. Powers' agitation and nervousness that escalated as the arrest progressed, the fact that Mr. Powers had indicated this was his first arrest, or any statements concerning the suspicion that Mr. Powers was under the influence of an unknown illegal substance. *Declaration of Max Krupo at ¶ 11.* All of these facts should have been communicated to MPD as they would suggest that Mr. Powers be closely watched and monitored. *Id.*

Based on the Defendants' declarations, it appears that the evidence was found after Mr. Powers was under full custodial control of the officers on the scene.  He in effect was under arrest at the time his vehicle was searched and the "cigarette box" was examined.  *Declaration of Max Krupo at ¶ 13*.  The evidence used to sustain the charge of Possession with Intent to Distribute Cocaine was clearly obtained without the permission of Mr. Powers and therefore calls the validity of the arrest into question.  *Id.*  When Mr. Powers was placed into custody and under the control of Officer Burdyn, his vehicle should have been secured and any search for evidence suspected by the officers should have been conducted with an appropriate search warrant approved by the court.  *Id.*

If Officer McQueen suspected that Mr. Powers was in possession of a weapon and feared for his own safety his approach to this life threatening situation was certainly cavalier.  *Id. at ¶ 14*.  It is incomprehensible and contrary to standard training that if an officer was in fear for his safety and suspected that a subject was in possession of a weapon that he (the officer) would "ask him for it" and permit him to retrieve it from a pocket of the car.  *Id.*  When weapons are involved, officers are trained to take control of the situation and the subject and to seize the weapon to minimize any possible injury or death to the officers or innocent bystanders.  *Id.*  Law enforcement personnel are also trained that they must be able to provide articulable reasons for the search and seizure of the evidence in this type of case.  *Id.*  Officer McQueen did not observe a weapon, narcotics or any type of contraband in plain view, he was acting on a bare suspicion and possessed a hunch of what Mr. Powers had in his vehicle.  At the time of the search he lacked clear reasonable suspicion or probable cause for a search.  *Id.*  Further, the evidence that had been allegedly manipulated by Mr. Powers was placed in the map pocket and was no longer in possession of Mr. Powers.  Based upon the totality of the circumstances in this case the

decision to search should have been determined by a review by the court and then conducted under a properly issued search warrant. *Id.* In this case there were certainly no exigent circumstances that would make a search without a warrant appropriate. Therefore, the search conducted of Mr. Powers and his vehicle violated his Constitutional Rights. *Id.*

When Mr. Powers was transferred to MPD, the record suggests that proper policies and procedures were not followed despite all of the Declarants' suggestions that they knew MPD policies and procedures. Mr. Powers was not booked or processed and items that posed a danger to his health and safety were not removed from his possession. These things should have occurred once Mr. Powers arrived at the Third District. *Declaration of Max Krupo at ¶ 15.* Furthermore, the USSS officers and MPD officers failed to place Mr. Powers in general lockup, and failed to place Mr. Powers in a cell which was readily observable. Instead, they placed Mr. Powers in an isolated area with no explanation, and then failed to monitor Mr. Powers in accordance with MPD policies and procedures despite knowing that he had become agitated during the arrest, knowing that this was his first arrest and suspecting that he was under the influence of a unknown illegal substance. Placing Mr. Powers in an isolated and unmonitored cell under the totality of the circumstances was inappropriate and in violation of standard policies and procedures. *Id.* The fact that this was Mr. Powers' first arrest, that he had become agitated during the arrest, and that he was under the influence of an unknown illegal substance, all suggest that the Officers are obligated to pay close attention to Mr. Powers while in their custody. *Id.* The Officers failed to do so.

The MPD and the Third District have directives, policies and procedures in place which direct the station clerk to monitor detainees. *Declaration of Max Krupo at ¶ 16.* Specifically, the Station Clerk has monitors at his station that are live pictures of the cells. *Id.* In addition,

video-recordings of the monitored cells are kept in a locked file cabinet. *Id.* At this time, no tape has been produced by the Third District which would establish the times officer's actually checked on Mr. Powers and/or monitored his condition. Further, no deposition of the Station Clerk has occurred which would permit the discovery of the timeline of events and the monitoring that actually occurred at the Third District on the evening of Mr. Powers' death. Further, this tape would clearly provide a record of Mr. Powers' condition and conduct while in custody. This information is necessary in order to determine whether the actions and inactions of the Officers were in violation of their duties and the policies and procedures designed to protect detainees from injuring themselves and others. Therefore, discovery is warranted on these material issues pursuant to Rule 56(f).

Once Mr. Powers was found in his cell in a unresponsive condition, there were apparently radio communications that followed. Any and all communications that concerned Mr. Powers from midnight until he was removed from the MPD after 8:00 a.m. should be made available during discovery and would provide not only a timeline, but potentially the most accurate statements of the witnesses involved. These radio communications would include communications from the USSS and the MPD. Obviously, it is important to check the accuracy of the Declarations against the recorded statements of the Officers involved for information that has been left out or changed. Pursuant to Rule 56 (f), Plaintiff requests the opportunity to conduct discovery for this material and relevant information.

Once Mr. Powers was pronounced, a homicide investigation would have been conducted which would have included obtaining detailed statements from all officers on duty and involved in the incident. These statements would have been given closer in time to the events in question than the Declarations provided in June 2007. Pursuant to Rule 56 (f), Plaintiff requests the

opportunity to conduct discovery in order to obtain this vital and relevant information which would provide material facts concerning witnesses observations.

With respect to the autopsy, Defendants have provided an expert witness report for an expert that has yet to be produced and cross-examined. The photographs on which the Defendant's expert relies have not been produced nor has he suggested the extent to which the photographs permit him to render opinions to a reasonable degree of medical certainty. Certainly, if he were performing an actual autopsy, he would not rely on pictures but on actual examination. Further, the statements of Defendants' expert do not address Plaintiffs' claims of injuries with sufficient particularity such that Summary Judgment is warranted without further investigation. First, Dr. Arden disagrees that there was bruising on Mr. Powers' buttocks but does not suggest that there was not any bruising on his back and legs consistent with fresh injuries caused during the course of the stop, arrest and custody. He further opines about patterns of injuries but provides no factual or medical support for these opinions. He talks about "typical injuries" but provides no foundation for these conclusory statements. In fact, Dr. Arden concedes that several of the injuries identified on Mr. Powers' body "theoretically are consistent with strikes by an elongated object." Declaration of Dr. Arden at ¶ 5. Dr. Arden does not dispute that Mr. Powers could have been subject to blows from the Officers, but appears to merely take issue with whether the blows were consistently inflicted by a baton or an object. *See, Declaration of Dr. Arden at ¶ 5-7.* Dr. Arden also concedes that he cannot establish with reasonable medical certainty that the "fresh" injuries to Mr. Powers did not occur at the time of Mr. Powers' arrest. *See Declaration of Dr. Arden at ¶ 8.* Furthermore, according to the Defendants' own expert, Mr. Powers had "substantial concentrations of ethanol (alcohol) and cocaine in his system at death, even after being in custody for nearly four hours, during which time he would continue to metabolize

them." *See Declaration of Dr. Arden at ¶ 10.* Despite Dr. Arden's opinion that Mr. Powers was intoxicated and under the influence of cocaine, the Defendants failed to take actions necessary to protect Mr. Powers in his impaired state.

### III.     Legal Standard.

### a.     Rule 12(b)(6):

Upon a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), a complaint should not be dismissed unless "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Slade v. Hampton Roads Regional Jail*, 407 F.3d 243, 248 (4th Cir. 2005); *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). Moreover, when such a dismissal involves a civil rights complaint, "we must be especially solicitous of the wrongs alleged" and "must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Harrison v. United States Postal Serv.*, 840 F.2d 1149 (4th Cir. 1988) (internal quotation marks omitted).

A court may grant a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99 (1957). When reviewing a motion to dismiss, a court assumes "the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations" and examines only the legal sufficiency of the complaint. Id. While the court must view the facts in a light most favorable to the plaintiff, the court "need not accept the legal

conclusions drawn from the facts," nor should it "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Associates, Ltd. Partnership,* 213 F.3d 175 (4th Cir. 2000).  A judge may not grant a 12(b)(6) motion based on a disbelief of a complaint's factual allegations. *Wright v. MetroHealth Medical Center*, 58 F.3d 1130, 1138 (6th Cir. )

The Federal Rules of Civil Procedure provide a powerful presumption against rejecting pleadings for failure to state a claim.  Rule 8 sets aside the hypertechnical pleading rules by requiring nothing more than a plain recitation of the facts that a party believes entitles her to relief. Thus, although Rule 12(b)(6) authorizes prompt dismissal of claims where the party's belief proves mistaken, its sanction extends only to a formal testing of the legal sufficiency of the factual basis the pleader asserts in support of her claim.

The Rules also protect parties who have tried but have not completely succeeded in stating a claim.  Rule 15 authorizes amendments that seek, among other things, to cure pleading defects.  Under Fed. R. Civ. P. 15(a), a plaintiff may amend his complaint one time as a matter of course before the defendant files a responsive pleading. Fed. R. Civ. P. 15(a). Once the defendant files a responsive pleading, however, the plaintiff may amend his complaint only by leave of the court or by written consent of the defendant.  Id.  Rule 15(a) directs that leave to amend "shall be freely given when justice so requires."  Id.  This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities. *See Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99 (1957)(" The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."); *Ostrzenski v. Seigel*, 177 F.3d 245, 252-53 (4th Cir. 1999)("The

federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that [the] plaintiff be given every opportunity to cure a formal defect in his pleading." (quoting 5A Charles Allen Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (2d ed. 1990))).

The Courts have interpreted Rule 15(a) to provide that "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *See Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 509 (4th Cir. 1986) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227 (1962). Whether an amendment is prejudicial will often be determined by the nature of the amendment and its timing. A common example of a prejudicial amendment is one that "raises a new legal theory that would require the gathering and analysis of facts not already considered by the [defendant, and] is offered shortly before or during trial." Id. An amendment is not prejudicial, by contrast, if it merely adds an additional theory of recovery to the facts already pled and is offered before any discovery has occurred. *David v. Piper Aircraft Co.*, 615 F.2d 606, 613 (4th Cir. 1980) ("Because defendant was from the outset made fully aware of the events giving rise to the action, an allowance of the amendment could not in any way prejudice the preparation of the defendant's case.").

**b.    Rule 12(b)(1):**

Under Rule 12(b)(1), the plaintiff bears the burden of establishing by a preponderance of the evidence that the Court possesses jurisdiction. *See Shekoyan v. Sibley Int'l Corp.*, 217 F.Supp.2d 59, 63 (D.D.C. 2002); *Pitney Bowes Inc. v. U.S. Postal Serv.,* 27 F. Supp.2d 15, 19 (D.D.C. 1998). It is well established that, in deciding a motion to dismiss for lack of subject matter jurisdiction, a court is not limited to the allegations set forth in the complaint, "but may

also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case. *Alliance of Democracy v. Fed. Elec. Comm'n*, 362 F. Supp. 2d 138, 142 (D.D.C. 2005); *see Lockamy v. Truesdale*, 182 F. Supp. 2d 26, 30-31 (D.D.C. 2001).

  c**.**  **Summary Judgment Standard:**

  Under Rule 56(c), a party is entitled to summary judgment in his favor if the pleadings, depositions, answers to interrogatories, and admissions on file, together wit affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law. The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986). Any potential problem with a premature motion can be adequately dealt with under Rule 56(f) of the Federal Rules of Civil Procedure, which allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity **to make full discovery.** F.R. Civ. P. 56(f). Protections afforded by Rule 56(f) is an alternative to response in opposition to Motion for Summary Judgment and is designed to safeguard against premature grant of summary judgment. *See Shavrnoch v. Clark Oil & Ref. Corp.*, 726 F.2d 291, 294 (6th Cir. 1984); *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 832-33 (10th Cir. 1986). In this case, Plaintiff has not yet been afforded the opportunity to take depositions or other discovery which permit the challenge to the veracity of witnesses, nor has the documentary evidence been produced which would provide a more accurate record of the events that surround Mr. Powers death. Instead,

Defendant has converted a motion to dismiss to a motion for summary judgment by attaching self-serving declarations that have not been subject to cross-examination.

> **IV.    Defendants Challenge to Plaintiffs' Constitutional Claims Based on Newly Created and Self-Serving Declarations does not Create an Adequate Record for Summary Judgment:**

In support of the Federal Defendants Motion to Dismiss and/or for Summary Judgment, the Defendants attach the Declarations of three witnesses. These witnesses now "remember" with much greater clarity and detail than they documented the actual official police record in this case. Nonetheless, the Declarations provide more disputes than they resolve.

Despite being the apparent author of the Incident-Based Event Report (the "Report") which was generated on the evening of the arrest, Agent Burdyn chose not to include most of the facts alleged in his Declaration in the official record related to the events surrounding the arrest of Mr. Powers. This alone provides enough suspicion to at least permit the Plaintiff the opportunity to investigate the reasons Agent Burdyn did not document the facts he now alleges in his Declaration in the actual instrument which is designed to provide an official police record.

Strangely absent from the Report is any description of Mr. Powers' activities, or for that matter the Agents' activities, from the time Mr. Powers allegedly ran the red light until the time the Agent decided to pull him over. According to the Declaration of Officer Burdyn, at around 12:30 a.m. Officer Burdyn observed a black Mazda Miata…traveling eastbound on Massachusetts Ave., N.W., drive through a red traffic signal at the intersection of Mass. Ave. and Dupont Circle. But Officer Burdyn did not stop Mr. Powers until 12:39. Burdyn Declaration at ¶ 2. For nine minutes, Officer Burdyn apparently followed or observed Mr. Powers after supposedly witnessing him run a red light. However, there is no description of the reasons for following Mr. Powers.

According to Officer Burdyn's description in the Report, Mr. Powers was observed "retrieving an object from behind the passenger seat and placed them into a cigarette box…..The cigarette box contained 5 clear plastic zips containing a white powder substance." Exhibit No. 2. There is no mention in the Report of the probable cause to search the cigarette box. In fact, there is no mention of the location of the cigarette box, or any mention of suspected weapons on Mr. Powers or in the cigarette box. The Report contains no statement of Officer McQueen nor does it mention Officer McQueen's alleged mental impressions. *See* Exhibit No. 2. In Agent Burdyn's Declaration, however, Agent Burdyn purports to have full knowledge of the mental impressions of Officer McQueen, an Officer that has not provided a Declaration or any testimony in this matter. According the Burdyn's Declaration, while Agent Burdyn was at his cruiser, "Officer McQueen, who was positioned next to the passenger's side of the car, observed Mr. Powers reach behind the front passenger's seat with his right hand and remove an unknown object. He then observed Mr. Powers manipulating that object, which Mr. Powers placed in the map pocket. Officer McQueen suspected that it could be a weapon. So Officer McQueen asked Mr. Powers for the box, and asked Mr. Powers out of the car." *Declaration of Officer Burdyn at ¶ 5.*

First, Agent Burdyn is providing sworn statements under oath that are not based on his own knowledge or understanding and are simply self-serving and unsupported by the record since Officer McQueen has yet to provide a statement or be deposed. Second, there is no suggestion in the Report that there is suspicion of any weapon in Mr. Powers possession that would permit a search of the contents of the pocket in the car. Third, there is no description of the unknown object that would even suggest the object being manipulated by Mr. Powers was sufficiently large to be a weapon. Finally, clearly if Officer McQueen truly thought it was a

weapon, he wouldn't have asked Mr. Powers to get it for him. There is no statement in the Report that suggests Mr. Powers consented to any search of the vehicle or his person or sufficient evidence to support a finding of probable cause that Mr. Powers had contraband on his person. *See* Exhibit No. 2. There is no search warrant obtained by the officers to search the pocket of the vehicle or the contents of a cigarette box. Mr. Powers was not placed under arrest until well after the search of the pocket of the car and the cigarette box occurred. Therefore, it could not be a search performed incident to an arrest. Thus, even based on the newly authored Declaration, the Officers performed an illegal search which violated Mr. Powers' Constitutional Rights. *Declaration of Max Krupo at ¶¶ 7, 13, 14.*

The Declaration of Officer Burdyn suggests that prior to approaching Mr. Powers he "radioed in the stop". Plaintiff would request under Rule 56(f) the opportunity to discover all radio communications related to this stop and arrest and investigate the veracity of the Officers' declarations concerning the reason for the stop.

**"**Officer Burdyn suggests in his Declaration that Mr. Powers denied any alcohol consumption. He did not slur his words, and I did not smell any alcohol on his breath." Burdyn Declaration at ¶ 8. According the Declaration of Defendant's expert, Dr. Arden, however, "Mr. Powers had substantial concentrations of ethanol (alcohol) and cocaine in his system at death, even after being in custody for nearly four hours, during which time he would continue to metabolize them." Arden Declaration at ¶ 10. Officer Burdyn offers no explanation for his inability to recognize a significantly intoxicated individual. Perhaps this is because it might provide a recognized reason to provide closer surveillance or observation of him while in police custody to make sure he didn't require medical attention or other intervention. *See, Exhibit No. 1, Declaration of Max Krupo at ¶ 15.*

Officer Burdyn's Declaration is inconsistent with Officer Beres' Declaration. According to Officer Burdyn, "Officer Brown and I assumed control over Mr. Powers when he arrived at the 3rd District Station salle port. I read Mr. Powers his rights. While waiting outside the cell block for the MPD officer to receive the prisoner, I removed my handcuffs from Mr. Powers and had him stand against a wall. I walked him into the cell block when the MPD officer was ready." Burdyn Declaration at ¶ 12. However, according to the Declaration of Officer Beres, "when we arrived at the 3rd District Station, I took Mr. Powers into the station and turned him over the MPD Officers in charge of the Third District cellblock and left the station." Beres Declaration at ¶ 6. Despite the inconsistencies, what is lacking from both statements is the actual communications associated with the transaction of transferring Mr. Powers to the custody of MPD. Neither Burdyn nor Beres suggest that they did or did not inform MPD of the facts that Mr. Powers was under the influence of an unknown illegal substance, that this was his first arrest, that he had become agitated during the arrest, or that they had not removed all of the items from his possession that could cause injury.

Finally, according to all of the Declarations of the Officers, they complied with policies and procedures of the USSS/UD and MPD. *See*, Beres Declaration at ¶ 6; Burdyn Declaration at ¶ 14. Despite these representations, they failed to comply with MPD procedure when they failed to process and book Mr. Powers, failed to remove items which could cause injury, isolated Mr. Powers without checking on him, and failed to take into account the fact that this was his first arrest, he was agitated during the arrest, he was under the influence of an unknown illegal substance which would suggest he should not be isolated without monitoring. *Exhibit No. 1, Declaration of Max Krupo at ¶ 15.*

**V.     Federal Defendants' claims that they did not use "Excessive Force" against Mr. Powers are inconsistent with the Autopsy Findings and Photographs and Not Supported by Defendants' own Expert, Dr. Arden:**

In support of the Federal Defendants Motion, Defendants suggest that based upon the newly created declarations of Officers Giles and Burdyn that the Federal Defendants did not use force against Mr. Powers.  The Federal Defendants suggest that Plaintiff's allegations the Mr. Powers sustained injuries and pain and suffering is the "product of imagination."  However, Mr. Powers' autopsy report suggests otherwise. *See Autopsy attached as Exhibit No. 4 to Defendants' Motion.*  Further, Defendants' own expert witness cannot deny the possibility that the injuries evidence in the autopsy report and photographs did not occur during Mr. Powers arrest and custody, although he suggests one cannot establish that they were either.  *See Declaration of Dr. Arden at ¶ 5-8.*  Further, Dr. Arden admits at least some of the injuries are consistent with strikes by an "elongated object."  Even Dr. Arden cannot state to a reasonable degree of medical certainty that the injuries are clearly evidenced on Mr. Powers' body did not occur which in the custody of the Officers.  Certainly, Plaintiff did not fabricate the injuries.

Further, there are several witnesses, many of which are disclosed in the newly generated Declaration attached to the Federal Defendants' Motion, that have not provided statements, and their activities are not described in the declarations.  For instance, the Declarations do not indicate that Officer McQueen did not strike Mr. Powers nor was there a statement by Officer McQueen suggesting that he did not strike or witness Mr. Powers being stricken by other Officers.

**VI.     Plaintiff has sufficiently alleged Actionable 5th Amendment Claims Stemming from Mr. Powers' Status as a Pretrial Detainee:**

In order to establish that the individual Defendants were "deliberately indifferent" in violation of the Fifth Amendment, Plaintiff must allege that they had "subjective knowledge of [Mr. Power's] serious medical need and recklessly disregarded the excessive risk to [his] health or safety from that risk." *Baker v. District of Columbia*, 326 F. 3d 1302, 1306 (D.C. Cir. 2003)**.** The Seventh Circuit described the requirements for proving prison suicide claims against individual officers in the context of the Eighth Amendment, which are identical to the requirements for proving claims under the Fifth Amendment based on pretrial detainee suicides as follows:

> [A] claim based upon a violation of the Eighth Amendment has both an objective and subjective element: (1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety. In prison suicide cases, the objective element is met by virtue of the suicide itself, as "[it goes without saying that 'suicide is a serious harm'"

> Where the harm at issue is a suicide or attempted suicide, the second subjective component of an Eighth amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was a substantial risk of committing suicide and (2) intentionally disregarded the risk.

*Collins v. Seeman*, 462 F.3d 757, 760-61 (7th Cir. 2006).

This Court already found that Plaintiff has pled facts sufficient to satisfy both elements of the claim. Opinion at p. 14. While the Court dismissed the Constitutional claims against individual Defendants based on vicarious liability, and the claims against the individual defendants in their official capacities, it requested a more definite statement as to the Plaintiff's claims against the individual defendants in their personal capacities for alleged direct violations of Mr. Power's Fifth Amendment rights.

In response to the Court's order, the Plaintiff's First Amended Complaint alleges the following:

17.     While in the care and custody of the MPD, Mr. Powers was interrogated by Officers Giles, Brudyn and other MPD officers, without being apprised of his constitutional rights, without being booked and without being processed.   The interrogation of Mr. Powers did not conform to the general orders, policies and procedures of the MPD.

18.     During the interrogation and at other various times, Officers Giles, Brudyn and other officers of the MPD questioned Mr. Powers in an emotionally abusive manner, including leading Mr. Powers to believe that he was going to jail for the alleged drug possession and questioning him in such a way so as to cause Mr. Powers a serious belief that he would be seriously harmed if he were to go to jail.

19.      At all times during the interrogation, the Watch Commander and Sgt. R. W. Gamble of the MPD supervised and were aware of the interrogation of Mr. Powers; were aware of the threats made to Mr. Powers; and were aware of the conduct of the interrogation, including the statements made by both the officers and Mr. Powers.

20.     During the interrogation and thereafter, Mr. Powers became extremely concerned, nervous, worried and anxious, based on the threats of Officers Giles, Brudyn and other officers of the MPD that he would be going to jail.  Mr. Powers asked repeatedly if he were going to jail and stated on numerous occasions that he could not go to jail.  These statements were made to Officers Giles and Brudyn, and which Sgt. Gamble and the Watch Commander either heard or were made aware of Mr. Powers' statements, concerns, and generally nervous and anxious state of mind.

[…]

27.     Defendants Watch Commander and Sgt. Gamble, either placed or were aware that Mr. Powers had been placed in a separate jail cell, away from the general population.  Mr. Powers was allegedly segregated, among other reasons, because he was gay.  Based on information and belief, the placement of Mr. Powers in a separate isolated cell was meant to emphasize the statements that he would be harmed if he were to go to jail if he were to be placed in general population with other inmates since he was gay, and designed to intimidate, isolate and scare Mr. Powers.

[…]

29.     At all times relevant hereto, Offices Giles and Brudyn, as well as Sgt. Gamble and the Watch Commander knew that Mr. Powers had not been properly booked or entered into the arrest book, yet was being held, improperly and in violation of his civil rights in a jail cell.

30.     Clearly and observably, Mr. Powers had been traumatized by the arrest, the interrogation, and the assault on him while in custody.  Mr. Powers' stated fears that he could not go to jail as well as his behavior while in custody should have signaled to Officers Giles and Brudyn, Defendant Gamble as well as the Watch Commander that Mr. Powers could possibly harm himself.   Defendants recklessly disregarded the risks to Mr. Powers' health and/or safety.

31.     Sgt. Gamble, the Watch Commander and other officers of the MPD failed to ensure Mr. Powers' safety; were deliberately indifferent to his health and/or safety; and violated his constitutional rights by failing to remove clothing articles that Mr. Powers used to commit suicide, i.e., his socks.

32.     At or around 0200 hours Mr. Powers, who was Caucasian and gay, was placed in a jail cell, isolating him from the general detainees.  The view into the jail cell

was partially blocked from view. Mr. Powers, was not permitted to make a phone call or make any other contact with anyone from outside the Third District after he was detained. […]

35.    Defendants, including the Watch Commander and Sgt. Gamble, and Officers Giles and Brudyn knew that they had not removed items that could be used to cause harm to Mr. Powers, and that Mr. Powers could be in danger of inflicting self-harm yet failed to check on Mr. Powers in his jail cell for almost a 2 hour period. The failures to check on Mr. Powers and remove items that could be used to cause him harm created a known substantial risk that serious harm would occur, in the form of his suicide.

36.    Officers Giles and Brudyn, Defendant Gamble and Watch Commander were aware that there were certain sensitivities related to Mr. Powers, including his highly emotional state and his stated fear that he could not go to jail, and that he was capable of hurting himself with items that they failed to remove from his possession.

Plaintiff's First Amended Complaint has identified the personal involvement of Officers

Giles, Burdyn, Gamble and the Watch Commander. While the Plaintiff still has the significant

disadvantage of providing the First Amended Complaint prior to the initiation of discovery, the

Plaintiff has complied with the requirements of Rule 8. The civil-rights plaintiff, as with others,

is entitled to meet only the liberal notice pleading standards of Rule 8. *See*, *Crawford-El v.

Britton*, 523 U.S. 574, 591-92 (1998). Further, attached hereto as Exhibit No. 1, is the

Declaration of Max Krupo. This Declaration suggests that in his opinion, as a seasoned veteran

of law enforcement, that the Defendants failed to follow proper policies and procedures to which

the Declarants claim to be cognizant. Specifically, Mr. Krupo's Declaration establishes that

proper policies and procedures were not followed when Mr. Powers was not booked or processed

and items that posed a danger to his health and safety were not removed from his possession.

*Exhibit No. 1, Declaration of Krupo at ¶ 15.* Furthermore, the officers failed to place Mr.

Powers in the general lockup and failed to place Mr. Powers in a cell which was readily

observable. *Id.* Rather, they placed Mr. Powers in an isolated area without justification, failed to

monitor him in accordance with the policies and procedures which mandate that Mr. Powers, like

all detainees, be monitored. *Id.* Defendants also knew that this was his first arrest and

suspecting that he was under the influence of an unknown illegal substance and had not been

properly booked or processed in violation of standard policies and procedure.  *Id.*  Finally, Mr.

Powers had become agitated during the arrest.  All of these facts suggest that Plaintiff has

sustained the two prongs of *Collins v. Seeman*, 462 F.3d 757, 760-61 (7th Cir. 2006).

In the case at hand, the Plaintiff has alleged that Mr. Powers was subject to personal

injury to his body consistent with blows sustained from a night stick, as well as a lack of care in

his confinement and deliberate indifference to his safety and wellbeing as demonstrated by the

Defendants' collective failure to process and book Mr. Powers, including the removal of items

that could cause him injury while in custody, and deliberately failing to monitor his condition

when they unreasonably placed him in an isolated area.[1]  The Plaintiff has alleged that

Defendants' acts and omissions prior to finding Mr. Powers' hanging support a constitutional

claim.

Despite all of the Defendants' failures to act, Defendants argue that Plaintiff has failed to

meet the two part test identified in *Farmer v. Brennan*, 511 U.S. 825 (1994) for the sufficiency

of allegations of deliberate indifference to the health and safety of a detainee.  The Supreme

Court defined the first prong of the test as an alleged deprivation of sufficient seriousness such

that the official's act or omission must result in the denial of the minimal civilized measure of

---

[1] Defendants' duties with respect to Mr. Powers' health and safety do not end when they find him hanging in his cell by the socks they permitted him to possess in an unsupervised and remote cell even after he had expressed concern numerous times over the possibility of jail time.  Rather, their obligations continue throughout their individual and collective responses to finding Mr. Powers hanging in his cell.  The MPD Incident Report which was prepared on the date of Mr. Powers' death fails to document any attempts by the officers to revive Mr. Powers.  (*See*, Exhibit No. 1), MPD Incident Report.  Rather, it appears from the information documented in their own report that the officers waited for medics to arrive.  *See, id.*  This alone would be sufficient to support Plaintiff's claims.  *See, Bradich v. City of Chicago*, 413 F.3d 688 (7th Cir. 2005)(reversing summary judgment granted to lockup keepers in a 42 U.S.C.S. § 1983 action when, during the critical 10 minutes after they found the inmate hanging in his cell, they did not call for help, did not attempt CPR but instead shouted and shook the inmate, and altered their log books).  The individual Defendants' failure to respond appropriately to Mr. Powers' condition upon discovering him hanging in his cell would also support a ruling that they are not entitled to qualified immunity.  *See id.* at 692 (suggesting that lockup keepers are not entitled to qualified immunity because no reasonable officer could think that the Constitution allowed him to cover up his own misconduct at the expense of a prisoner's life).

life's necessities.  Second, the government official must be "deliberately indifferent to a substantial risk of serious harm to the person in custody."  *Id.* at 828.  In order to establish liability, a government official must be "deliberately indifferent to a substantial risk of serious harm to a pretrial detainee." *Id.* at 828.  With "deliberate indifference" lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the courts of Appeals have routinely equated deliberate indifference with recklessness.  *Id*. at 824.  Under the *Farmer* test, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.  *Id.* at 842.  Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.  *Id.*  At the motion to dismiss stage of the litigation, this would be where the fact that there was a general order that the prison official failed to follow at the time of Mr. Powers' detainment is some evidence of the Defendants' knowledge of a substantial risk of serious harm which the general order was designed to protect against.  *Id.*

Prior to being permitted any discovery on this issue, the Plaintiff has alleged that there was a policy and procedure that was ignored in this case.  While this failure alone may be insufficient to prove the Plaintiff's allegation of constitutional violation in its entirety, it is evidence that is appropriately considered in determining directly or inferentially the individual defendants' knowledge of a substantial risk.  *See*, *District of Columbia v. Walker*, 689 A. 2d 40, 47 (D.C. 1997).  Further, an examination of the state of mind of the Defendants through the discovery process is required to fully evaluate the deliberate indifference standard defined in *Farmer*.  Further, Plaintiff has provided the Declaration of Mr. Krupo in support of her

contention that the Defendants' conduct supports the Fifth Amendment claims.  Therefore, pursuant to Rule 56(f), this issue is more appropriately addressed after factual discovery has proceeded as the Plaintiff has not had a full opportunity at this stage in the proceedings to discover all of the actions and intentions of each defendant.

VII.    **Defendants are not Entitled to Qualified Immunity:**

Defendants next argue that suit against the District Employees in their official capacity is duplicative of the action against the District.  However, this is true only if the District accepts responsibility for all of its employee's and agent's actions and will not raise the defense that any of the Defendants acted outside the scope of their employment.  Further, this is true only when the District Employees are entitled to qualified immunity.  The inquiry into whether a defendant can assert qualified immunity proceeds in two steps.  First, the court must determine if the pleaded facts demonstrate that the defendant's conduct violated a constitutional right. *Ridpath*, 447 F.3d at 306. The alleged violations of the constitutional rights of Mr. Powers have already been discussed above.  If the facts do not establish the violation of a right, qualified immunity will apply, and the motion to dismiss on that basis should be granted.  But, if a violation is established, "the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001).  The Defendants' claims of qualified immunity are founded on an alleged lack of facts that the individual defendants had notice that Mr. Powers may commit suicide while in their custody and control.  What Plaintiff has plead are the facts that were available to her at the pleading stage, prior to obtaining discovery from the defendants.  Certainly, the allegations in the Complaint suggest that all of the Defendants participated in numerous constitutional violations, including their failure to take appropriate steps to ensure Mr. Powers safety and protect him from excessive force.  Plaintiff has further

27

supported this contention with the Declaration of Mr. Krupo attached hereto as Exhibit No. 1.

Qualified immunity is not the law simply to save trouble for the Government and its employees;

it is recognized because the burden of trial is unjustified in the face of a colorable claim that the

law on point was not clear when the official took action, and the action was reasonable in light of

the law as it was.  In this case, however, the allegations made by the Plaintiff relate to violations

of clearly established rights.  Further, the Affidavit of Mr. Krupo supports the Plaintiff's

contention that Defendants' collective failures violated established policies and procedures, and

infringed on Mr. Powers' Constitutional Rights.  Plaintiff has alleged an unlawful stop, an

unlawful search, excessive force, and deliberate indifference to the health of Mr. Powers.

Plaintiff has supported this contention with the Declaration of Mr. Krupo and the autopsy report

attached hereto as Exhibits 1 and 2.  Qualified immunity protects public officials from individual

liability in a 1983 action unless the officials violated 'clearly established . . . constitutional rights

of which a reasonable person would have known.'" Workman v. Jordan, 32 F.3d at 478 (quoting

Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727 (1982)  To successfully rebut a defense of

qualified immunity, the plaintiff must show (1) "that the defendant's actions violated a

constitutional or statutory right," and (2) that the right "allegedly violated [was] clearly

established at the time of the conduct at issue."

In 1989 the Supreme Court decided *Graham v. Connor*, 490 U.S. 386, 104 L. Ed. 2d 443,

109 S. Ct. 1865 (1989), and directed lower courts to analyze constitutional claims of excessive

force by applying Fourth Amendment standards of objective reasonableness. *See id.* at 395

("Today we make explicit . . . that all claims that law enforcement officers have used excessive

force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free

citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . .

."). The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. The Supreme Court further clarified its test for qualified immunity in excessive force cases laid down in the *Graham* Court in *Saucier v. Katz*, 121 S.Ct. 2151 (2001) when it enunciated a two-part inquiry: the threshold question is, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 121 S.Ct. at 2156. The determination of whether an individual defendant is entitled to qualified immunity is a factual question, and as such, a determination on this issue at this stage is premature.

VIII.    **Plaintiff has sufficiently Plead Intentional Infliction and Gross Negligence Claims:**

Defendants argue that, because their Declarations say so, the conduct of Officers Burdyn and Giles was not sufficiently outrageous to support a claim of intentional infliction of emotional distress. Defendants claim that the "record" clearly shows that Giles and Burdyn did not commit any of the acts alleged by the Plaintiff. The record to which the Defendant is referring is the newly generated, self-serving statements of the Officers that do not include key facts associated with the arrest of Mr. Powers, and have not been subject to cross-examination. Nonetheless, to rebut Defendants' contentions, Plaintiff has provided the Declaration of Mr. Krupo which suggests that the Officers failed to follow established policies and procedures, despite their self-proclaimed knowledge of the procedures, and failed to take appropriate action to protect Mr. Powers. Further, Mr. Krupo testifies that Defendants actions which began this entire chain of events constitute an unreasonable search and seizure that was conducted without probable cause and after a highly unusual stop. *Exhibit No. 1, at ¶ 5, 6, 7, 13.* To suggest that it is not

outrageous and grossly negligent for Defendants: to perform an illegal stop, search and seizure, subsequently fail process and book Mr. Powers; fail to communicate that they observed Mr. Powers become agitated during the arrest; fail to communicate the fact that this was his first arrest; and then allow Mr. Powers to be placed in isolation in an unmonitored cell while under the influence of an unknown illegal substance and in possession of objects that could injure Mr. Powers, and subsequently fail to monitor him, is just beyond the pale certainly at this stage of the proceedings. Certainly, given the allegations of the Amended Complaint together with the Declaration of Mr. Krupo, Plaintiff is entitled to discovery under Rule 56(f).

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests this Honorable Court deny the Federal Defendants' Motion to Dismiss, or for Summary Judgment. In the alternative, Plaintiff requests this Court permit Plaintiff discovery under Rule 56(f) and specifically requests that Plaintiff be permitted the discovery of the tapes associated with the stop, arrest, detention, and suicide of Mr. Powers, including the audio tapes of calls made by USSS and MPD officers, the homicide investigation including the statements taken of the Officers involved in the arrest and detention of Mr. Powers, the video surveillance tape of Mr. Powers' cell, and the depositions of the Officers, including Officers Burdyn, Giles, and McQueen.

## **REQUEST FOR HEARING**

Plaintiff hereby respectfully requests this matter be set in for a hearing on Defendants' Motion to Dismiss or in the alternative, for Summary Judgment.

Respectfully Submitted,

Rifkin, Livingston, Levitan & Silver, LLC


/S/

_____

M. Celeste Bruce, Esquire
Bar No.: 438343

Ellen B. Flynn, Esquire
Bar No.: 465355

6305 Ivy Lane, Suite 500
Greenbelt, Maryland 20770

(301) 345-7700 phone
(301) 345-1294 facsimile


Dated: July 3, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PATRICIA A. POWERS-BUNCE, Individually,    *
And as Personal Representative of the    *
ESTATE OF TERENCE ANTHONY POWERS    *
    *
    Plaintiff,    *
    *
v.    *    Case No. 06-1586 (RMC)
    *
DISTRICT OF COLUMBIA, *et al.*    *
    *
    Defendants.    *
_____    *

## **ORDER**

UPON CONSIDERATION of Federal Defendants' Motion to Dismiss, or in the

alternative, for Summary Judgment, and Plaintiffs' Opposition thereto for good cause shown, it

is this _____ day of _____, 2007, hereby and the same

ORDERED that Federal Defendants' Motion to Dismiss, or in the alternative, for

Summary Judgment is hereby and the same DENIED.

_____
Judge, United States District Court for the
District of Columbia