UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PATRICIA A. POWERS-BUNCE, Individually, <br> And as Personal Representative of the <br> ESTATE OF TERENCE ANTHONY POWERS <br><br> Plaintiff, <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.* <br><br> Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> *    Case No. 06-1586 (RMC) <br> * <br> * <br> * <br> * <br> * |

## Plaintiff's Statement of Genuine Issues

In accordance with Local Civil Rule 7(h), Plaintiff hereby submits this Statement of Genuine Issues:

**Factual Disputes:**

1.    The Federal Defendants have provided in support of their Renewed Motion to Dismiss, or in the alternative, Motion for Summary Judgment, Federal Defendants' Statement of Material Facts Not in Genuine Dispute. This Statement purports to recount the facts associated with the arrest according to three declarations of Officers involved in the arrest that have yet to be cross-examined or deposed, and have yet to be required to respond to discovery. Furthermore, additional documents exist that have not been produced or provided that will contain the statements of the Officers, including a transcript of radio communications, the homicide investigation reports and interview notes, as well as an field notes taken by the Officer. Unless and until these documents are provided and the Plaintiff has an opportunity to depose the Officers, Defendants' Motion is premature and simply serves as a pre-discovery attempt to obtain

information from Plaintiffs' witnesses. Nonetheless, the Statement provided by Defendants is contested by Plaintiff's Declaration of Max Krupo provided herewith as Exhibit No. 1 to the Memorandum in Opposition to Motion to Dismiss or in the alternative for Summary Judgment.

2.    While Plaintiff believes it is inappropriate to essentially require Plaintiff to produce her expert witnesses at this stage in the proceedings, in an abundance of caution the Declaration of Max Krupo is provided to highlight the inconsistencies and inaccuracies in the positions taken by Defendants in this matter as well as to identify the violations of policy and procedure that support Plaintiffs' claims. Mr. Krupo has reviewed the police record as well as the recently generated Declarations provided by Defendants.

3.    Officer Burdyn's explanations concerning the stop are highly unusual. The Incident Based Event Report authored by Officer Burdyn indicates that Mr. Powers was initially observed operating his vehicle eastbound in the "Unit block of Mass Ave. NW". Then he was observed passing a red light at the intersection of "Mass Ave. and Dupont Circle", and a traffic stop was effected in front of "1776 Mass Ave. NW". If this is correct the address for the traffic stop would have been 17 blocks from the initial sighting of Mr. Powers. Further, if he was traveling eastbound this would be inconsistent with him having traveled from the "Unit Block of Mass Ave" since this location is 17 blocks to the east. See, Declaration of Max Krupo at ¶ 4. Strangely absent from Officer Burdyn's declaration is any mention of where his initial observations occurred.

4.    In paragraph 2 of his declaration Officer Burdyn indicates that he observed Mr. Powers pass a red light at "12:30 AM" and then he effected a traffic stop at

"00:39. This would be nine minutes after he observed the violation and only one and one half blocks away. This is a very long time to effect a traffic stop after observing the violation. Conditions permitting, Officers generally stop traffic violators immediately (conditions permitting) upon observing the violation in order to limit the additional risk to the violators and others on the road. Nine minutes is a very long time between the observation and the stop, especially given the hour of the day. This is inconsistent with normal police operations and no justification is provided by Officer Burdyn for this lapse of time. *See, Declaration of Max Krupo at ¶ 5.*

5.      In paragraph 5 of his declaration, Officer Burdyn purports to testify from specific knowledge the observations of another officer, Officer McQueen. Officer Burdyn indicates that while Burdyn was at the cruiser, Officer McQueen observed from his vantage point beside Mr. Powers' vehicle that Mr. Powers reached behind the front passenger's seat with his right hand and removed an unknown object and placed it back in the map pocket. Officer Burdyn's declaration then states that "Officer McQueen suspected that it could be a weapon"  Officer Burdyn could not have known what Officer McQueen observed or his immediate conclusion concerning a weapon. Further, had Officer Burdyn and/or Officer McQueen suspected that Mr. Powers had a weapon, it should have been documented in the Incident Based Event Report. *See, Declaration of Max Krupo at ¶ 6.* Absent an opportunity to depose or examine Officer McQueen, it is not possible to determine whether Officer Burdyn's recitation of the impressions of Officer McQueen is accurate and complete. Furthermore, the actions of the Officers following this alleged suspicion of a weapon are inconsistent with an actual belief that Mr. Powers had a weapon.

    6.  In paragraph 5 of his declaration, Officer Burdyn states "Officer McQueen asked Mr. Powers for the box, and asked Mr. Powers out of the car. I returned to the car and took control of Mr. Powers while Officer McQueen examined the object in the map pocket." Since Mr. Powers was now under direct police control and the "box" was in the map pocket of the vehicle, there was clearly no present danger to any of the officers on the scene. Based on this statement it is clear that Mr. Powers was under custodial control by the police officers and that he was not asked for nor did he grant permission to search his vehicle. *See, Declaration of Max Krupo at ¶ 7.* At this point Officer McQueen did not observe a weapon or any type of contraband in plain view and therefore he lacked reasonable suspicion or probable cause to search Mr. Powers' vehicle. *Id.* Officer McQueen did not possess any articulable and particularized belief that would support his actions; he was operating on bare suspicion which is clearly prohibited unconstitutional conduct. *Id.*

    7.  In paragraph 11 of his declaration Officer Burdyn states that he searched Mr. Powers incident to his arrest on the scene and then in Paragraph 12 Officer Burdyn states that once at the Metropolitan Police Department Third District station he again searched Mr. Powers and found another zip bag with a white substance in his small coin pocket of his pants. This evidence should have been discovered at the scene of the arrest. *See Declaration of Max Krupo at ¶ 8.* Regardless of what was found in Mr. Powers' vehicle on the scene, if there was any concern by the officers that he may have possessed a weapon, for the safety of the officers a more thorough search would have been conducted on the scene. *Id.* The lack of a thorough search of Mr. Powers on the scene of

the arrest indicates that in fact the Officers were not worried about any type of weapon. *Id.*

8. In paragraph 4 of his declaration Sergeant Benita Giles, USSU/UD states "Mr. Powers had handed the officers a cigarette box which contained five small zip bags, filled with a powdered white substance, which he admitted were his." This statement is in direct conflict with Paragraph 5 of the declaration of Officer Burdyn which would suggest that either Sergeant Giles or Officer Burdyn's statement is inaccurate.

9. Paragraph 6 of the declaration of Sergeant Benita Giles states that Mr. Powers was "patted down" before being placed in Sergeant Beres's cruiser for transport. This is in conflict with paragraph 11 of Officer Burdyn's declaration, wherein he states that he "searched" Mr. Powers. A "pat down" is a lesser search of a prisoner and is usually reserved for a stop and frisk situation on the street. *See Declaration of Max Krupo at ¶ 10.* When a prisoner is transported and there has been any suspicion of a weapon (justified or not) a more thorough and complete search is required. *Id.* This "pat down" indicates that the Officers did not suspect Mr. Powers of possessing a weapon contrary to the assertions of Officer Burdyn. *Id.*

10. In paragraph 6 of his declaration Lieutenant Robert Beres, USSS/UD states that "When we arrived at the 3rd District Station, he took Mr. Powers into the station and turned him over to MPD Officers in charge of the Third District cellblock and left the station" This is in direct conflict with paragraph 12 of the declaration of Officer Burdyn wherein he states "While waiting outside the cell block for the MPD officer to receive the prisoner, I removed my handcuffs from Mr. Powers and had him stand against a wall. I walked him into the cell block when the MPD Officer was ready". There is no

mention by Officer Burdyn of Lieutenant Beres being involved in the physical transfer of Mr. Powers to the Third District cellblock personnel. These two statements are in such conflict that it is impossible at this time to determine who transferred custody of Mr. Powers for the USSS to the MPD. In addition, lacking from the statements are the communications between USSS concerning Mr. Powers' agitation and nervousness that escalated as the arrest progressed, the fact that Mr. Powers had indicated this was his first arrest, or any statements concerning the suspicion that Mr. Powers was under the influence of an unknown illegal substance. *Declaration of Max Krupo at ¶ 11*. All of these facts should have been communicated to MPD as they would suggest that Mr. Powers be closely watched and monitored. *Id.*

11.     Based on the Defendants' declarations, it appears that the evidence was found after Mr. Powers was under full custodial control of the officers on the scene. He in effect was under arrest at the time his vehicle was searched and the "cigarette box" was examined. *Declaration of Max Krupo at ¶ 13*. The evidence used to sustain the charge of Possession with Intent to Distribute Cocaine was clearly obtained without the permission of Mr. Powers and therefore calls the validity of the arrest into question. *Id.* When Mr. Powers was placed into custody and under the control of Officer Burdyn, his vehicle should have been secured and any search for evidence suspected by the officers should have been conducted with an appropriate search warrant approved by the court. *Id.*

12.     If Officer McQueen suspected that Mr. Powers was in possession of a weapon and feared for his own safety his approach to this life threatening situation was certainly cavalier. *Id. at ¶ 14*. It is incomprehensible and contrary to standard training

that if an officer was in fear for his safety and suspected that a subject was in possession of a weapon that he (the officer) would "ask him for it" and permit him to retrieve it from a pocket of the car. *Id.* When weapons are involved, officers are trained to take control of the situation and the subject and to seize the weapon to minimize any possible injury or death to the officers or innocent bystanders. *Id.* Law enforcement personnel are also trained that they must be able to provide articulate reasons for the search and seizure of the evidence in this type of case. *Id.* Officer McQueen did not observe a weapon, narcotics or any type of contraband in plain view, he was acting on a bare suspicion and possessed a hunch of what Mr. Powers had in his vehicle. At the time of the search he lacked clear reasonable suspicion or probable cause for a search. *Id.* Further, the evidence that had been allegedly manipulated by Mr. Powers was placed in the map pocket and was no longer in possession of Mr. Powers. Based upon the totality of the circumstances in this case the decision to search should have been determined by a review by the court and then conducted under a properly issued search warrant. *Id.* In this case there were certainly no exigent circumstances that would make a search without a warrant appropriate. Therefore, the search conducted of Mr. Powers and his vehicle violated his Constitutional Rights. *Id.*

   13. When Mr. Powers was transferred to MPD, the record suggests that proper policies and procedures were not followed despite all of the Declarants' suggestions that they knew MPD policies and procedures. Mr. Powers was not booked or processed and items that posed a danger to his health and safety were not removed from his possession. These things should have occurred once Mr. Powers arrived at the Third District. *Declaration of Max Krupo at ¶ 15.* Furthermore, the USSS officers and MPD officers

failed to place Mr. Powers in general lockup, and failed to place Mr. Powers in a cell which was readily observable. Instead, they placed Mr. Powers in an isolated area with no explanation, and then failed to monitor Mr. Powers in accordance with MPD policies and procedures despite knowing that he had become agitated during the arrest, knowing that this was his first arrest and suspecting that he was under the influence of an unknown illegal substance. Placing Mr. Powers in an isolated and unmonitored cell under the totality of the circumstances was inappropriate and in violation of standard policies and procedures. *Id.* The fact that this was Mr. Powers' first arrest, that he had become agitated during the arrest, and that he was under the influence of an unknown illegal substance, all suggest that the Officers are obligated to pay close attention to Mr. Powers while in their custody. *Id.* The Officers failed to do so.

14. The MPD and the Third District have directives, policies and procedures in place which direct the station clerk to monitor detainees. *Declaration of Max Krupo at ¶ 16.* Specifically, the Station Clerk has monitors at his station that are live pictures of the cells. *Id.* In addition, video-recordings of the monitored cells are kept in a locked file cabinet. *Id.* At this time, no tape has been produced by the Third District which would establish the times officer's actually checked on Mr. Powers and/or monitored his condition. Further, no deposition of the Station Clerk has occurred which would permit the discovery of the timeline of events and the monitoring that actually occurred at the Third District on the evening of Mr. Powers' death. Further, this tape would clearly provide a record of Mr. Powers' condition and conduct while in custody. This information is necessary in order to determine whether the actions and inactions of the Officers were in violation of their duties and the policies and procedures designed to

protect detainees from injuring themselves and others. Therefore, discovery is warranted on these material issues pursuant to Rule 56(f).

15. Once Mr. Powers was found in his cell in a unresponsive condition, there were apparently radio communications that followed. Any and all communications that concerned Mr. Powers from midnight until he was removed from the MPD after 8:00 a.m. should be made available during discovery and would provide not only a timeline, but potentially the most accurate statements of the witnesses involved. These radio communications would include communications from the USSS and the MPD. Obviously, it is important to check the accuracy of the Declarations against the recorded statements of the Officers involved for information that has been left out or changed. Pursuant to Rule 56(f), Plaintiff requests the opportunity to conduct discovery for this material and relevant information.

16. Once Mr. Powers was pronounced, a homicide investigation would have been conducted which would have included obtaining detailed statements from all officers on duty and involved in the incident. These statements would have been given closer in time to the events in question than the Declarations provided in June 2007. Pursuant to Rule 56(f), Plaintiff requests the opportunity to conduct discovery in order to obtain this vital and relevant information which would provide material facts concerning witnesses observations.

17. With respect to the autopsy, Defendants have provided an expert witness report for an expert that has yet to be produced and cross-examined. The photographs on which the Defendant's expert relies have not been produced nor has he suggested the extent to which the photographs permit him to render opinions to a reasonable degree of

medical certainty.  Certainly, if he were performing an actual autopsy, he would not rely on pictures but on actual examination.  Further, the statements of Defendants' expert do not address Plaintiffs' claims of injuries with sufficient particularity such that Summary Judgment is warranted without further investigation.  First, Dr. Arden disagrees that there was bruising on Mr. Powers' buttocks but does not suggest that there was not any bruising on his back and legs consistent with fresh injuries caused during the course of the stop, arrest and custody.  He further opines about patterns of injuries but provides no factual or medical support for these opinions.  He talks about "typical injuries" but provides no foundation for these conclusory statements.  In fact, Dr. Arden concedes that several of the injuries identified on Mr. Powers' body "theoretically are consistent with strikes by an elongated object."  Declaration of Dr. Arden at ¶ 5.  Dr. Arden does not dispute that Mr. Powers could have been subject to blows from the Officers, but appears to merely take issue with whether the blows were consistently inflicted by a baton or an object.  *See, Declaration of Dr. Arden at ¶ 5-7.*  Dr. Arden also concedes that he cannot establish with reasonable medical certainty that the "fresh" injuries to Mr. Powers did not occur at the time of Mr. Powers' arrest.  *See Declaration of Dr. Arden at ¶ 8.*  Furthermore, according to the Defendants' own expert, Mr. Powers had "substantial concentrations of ethanol (alcohol) and cocaine in his system at death, even after being in custody for nearly four hours, during which time he would continue to metabolize them."  *See Declaration of Dr. Arden at ¶ 10.*  Despite Dr. Arden's opinion that Mr. Powers was intoxicated and under the influence of cocaine, the Defendants failed to take actions necessary to protect Mr. Powers in his impaired state.

                   Respectfully Submitted,

        Rifkin, Livingston, Levitan & Silver, LLC

        /S/
        /s/
_____
M. Celeste Bruce, Esquire
Bar No.: 438343

Ellen B. Flynn, Esquire
Bar No.: 465355

6305 Ivy Lane, Suite 500
Greenbelt, Maryland 20770

(301) 345-7700 phone
(301) 345-1294 facsimile

Dated: July 3, 2007